UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 3:20-cv-

_____
D.R.,                                    )
                                         )
            Plaintiff                    )
v.                                       )
                                         )
GREGG BIGDA, LUKE COURNOYER,             )
RUPERT DANIEL,                           )
POLICE COMMISSIONER JOHN                 )
R. BARBIERI, and CITY OF SPRINGFIELD,    )
                                         )
                                         )
            Defendants_____ )

## COMPLAINT AND REQUEST FOR JURY TRIAL

## INTRODUCTON

1.      This civil rights action is brought for excessive force by police officers from the

        Springfield Police Department against minor D.R, then just a fifteen years old boy.  On

        February 26, 2016, then Springfield Police Officer Stephen Vigneault left his undercover

        police SUV idling outside a pizza shop in Springfield, MA, when he went in to get a

        pizza.   The police SUV was stolen, subsequently stopped and secured in the Town of

        Palmer, MA, where three minors, including plaintiff D.R., were apprehended.

2.      D.R. was forced to the cold, hard ground and handcuffed by Springfield Police officers.

        As D.R. lay face down and handcuffed, Defendant Gregg Bigda, then a Springfield police

        officer, screamed at D.R. "welcome to white town."   Gregg Bigda then proceeded to

        kick the defenseless D.R. multiple times in his face including near his temple area.  Luke

        Cournoyer searched D.R.'s pockets and seized his cellphone.  F.E., another minor, was

        taken to the ground by officers and bitten in the leg by a let loose police dog where

1

officers hit him with a clenched fist, kicked him in the face and spit on him.  F.E. was transported to the hospital.   D.R. was taken to the Palmer police station with another minor where the boys were separated in disparate holding cells.   Once separated and without a parent present or without the ability to contact a parent, Gregg Bigda interrogated D.R., screamed obscenities to him at a close range, shouted at him and made threats to him while he was locked in the cell while Luke Cournoyer stood silently by. Gregg Bigda reinforced the many ways he could brutalize him, bragged about his ability to plant drugs on him, told him that he would be taking him back to Springfield and that he would write whatever he wanted in his police report.  Luke Cournoyer stood alongside him.

3.      Defendant Rupert Daniel, a Springfield police captain, authorized Defendant Gregg Bigda and other Springfield Police Department (SPD) officers to leave the city of Springfield to pursue the stolen SUV even though there was no lawful basis for them to do so and despite the clear risk that the officers would violate the rights of anyone they caught.

4.      Defendant Commissioner Barbieri, a Springfield police commissioner, was the supervisor and policy maker of SPD'S standards of conduct and authorized defendant officers to continue in their role as police officers despite SPD's policy or custom of tolerating unreasonable force and other misconduct by its police officers. These policies permitted its police officers to believe they could violate civilian's civil rights with impunity.  The SPD's policies or customs permitted Officer Bigda and Luke Cournoyer to continue working as a police officer despite his own brushes with the law, a long and well-known

history of imbibing alcohol while on the job, using unreasonable force against civilians, falsifying police reports and providing false testimony under oath.

5.      Defendant City of Springfield is sued for its policy or custom of tolerating unreasonable force and other misconduct by its police officers. These policies permitted its police officers to believe they could violate civilian's civil rights with impunity.  The City's policies or customs permitted then Officers Bigda and Cournoyer to continue working as a police officer despite his own brushes with the law long and a well-known history of using alcohol and unreasonable force against civilians while falsifying police reports and providing false testimony under oath.

6.      To recover for the harms sustained at the hands of state actors in this matter, D.R. brings this action in federal civil rights under 42 U.S.C. § 1983 and for violation of his rights under the statutes and common law of Massachusetts.  Besides his claims against the individuals directly involved in the harms against him, D.R. brings civil rights claims against the city of Springfield and its policymakers.  The evidence shows they caused his harms directly by means of policy, usage, and practice in police matters amounting to assurance that officers could violate the rights of citizens at will, either with total impunity or at risk only of a symbolic and inconsequential euphemism for discipline.

## JURISDICTION AND VENUE

7.      This action is brought under 42 U.S.C. § 1983 and § 1988 for violation of plaintiff's rights guaranteed by the Fourth and Fourteenth Amendments to the United States

Constitution.  This Honorable Court has original jurisdiction of the federal claims

pursuant to 28 U.S.C. §§ 1331 and 1343.  The Court has supplemental jurisdiction of the

state law claims pursuant to 28 U.S.C. § 1367 because the state and federal claims arise

from the same case or controversy and have a common factual basis.

8.    Venue is proper because the acts and omissions which gave rise to the suit occurred in

this district, all parties reside and/or have their usual place of business in the district, and

all are subject to the personal jurisdiction of the Court.  28 U.S.C. § 1391(b); 42 U.S.C. §

2000e-5(f)(3).

## PARTIES

9.    Plaintiff, D.R., is and was at all pertinent times, a citizen of the United States and was a

resident of the Commonwealth of Massachusetts, in the County of Hampden, in the city

of Springfield.  He is currently residing in the city of Ware in the Commonwealth of

Massachusetts.  He was a minor child at all relevant times hereto.

10.    The defendant City of Springfield ("the City") is a duly incorporated municipality of the

Commonwealth of Massachusetts with a usual place of business located at 36 Court

Street, City of Springfield, County of Hampden, Massachusetts and is operating under the

Laws of the Commonwealth of Massachusetts.

11.    Defendant Gregg Bigda was at all material times hereto a sworn and duly appointed

police officer and detective of the Springfield Police Department ("SPD")  with a usual place

of business at 130 Pearl Street, Springfield, County of Hampden, Massachusetts. He resided

in Hampden County, Massachusetts.  His actions alleged hereto were taken under color of

law.

12.     Defendant Luke Cournoyer was at all material times hereto a sworn and duly appointed police officer and detective of the Springfield Police Department ("SPD")  with a usual place of business at 130 Pearl Street, Springfield, County of Hampden, Massachusetts. He resided in Hampden County, Massachusetts.  His actions alleged hereto were taken under color of law.

13.     Defendant Rupert Daniel was at all times relevant to this complaint a sworn and duly appointed captain of the SPD with a usual place of business at 130 Pearl Street, Springfield, Hampden County, Massachusetts.  His actions alleged hereto were taken under color of law.

14.     Defendant John Barbieri ("Commissioner Barbieri") is and was at all pertinent times the police commissioner for the City of Springfield, and was acting as agent, servant and employee with a usual place of business at 130 Pearl Street, Springfield, County of Hampden, Massachusetts.  His actions alleged hereto were taken under color of law.

**FACTS**

15.     Each of the previous paragraphs is incorporated as if fully set forth herein.

16.     At all pertinent times each defendant acted as alleged in this Complaint under color of the laws, statutes, ordinances, and/or regulations of the Commonwealth of Massachusetts and/or of the ordinances, regulations and/or rules of the City of Springfield.

17.     At all pertinent times the conduct of each individual defendant was done in his or her capacity as an employee, servant, or agent of the City of Springfield.

**A.  February 26, 2016**

18.     On February 26, 2016, Gregg Bigda and Luke Cournoyer together with other SPD
        officers Reif, Vigneault, Rodriguez and Robles were working the 4pm to midnight tour of
        duty.   All were part of the SPD Narcotics Bureau.

19.     At approximately 10:20p.m., then SPD Officer Vigneault, the partner of defendant
        Officer Bigda,  drove an SPD undercover police SUV to Primo's Pizzeria in Springfield
        to pick up a pizza for himself and the other members of the narcotics unit.  Officer
        Vigneault knew that SPD Officer Bigda had been drinking rum and it was believed the
        pizza would assist in sobering him up.

20.     Officer Vigneault left the SUV, an unmarked 2002 Chevy Trailblazer, idling and
        unattended in front of the pizza shop when he went inside for the pizza.   Once inside, he
        saw the SUV drive away.

21.     Officer Vigneault called defendant Officer Bigda, who drove to Primo's to pick him up.

22.     Officer Vigneault informed SPD dispatch what happened and a BOLO ("Be on the
        Lookout") for the SUV went out to all area police departments and patrols over the
        Western Massachusetts Law Enforcement Channel ("WMLEC").

23.     Defendant Officers Bigda and Cournoyer together with other SPD officers remained at
        the SPD police station on Pearl Street past the end of their shifts at midnight.   Officer
        Bigda and the others were drinking alcohol and growing increasingly intoxicated.
        Officer Bigda had been drinking rum throughout the night.

24.     The next morning at approximately 2:40 a.m., Officer Christopher Rogers of the
        Wilbraham Police Department ("WPD") saw the SUV Chevy Trailblazer drive past him
        and through a stop sign.

25.     Officer Rogers activated his emergency lights and followed the SUV, but it did not stop.

26.     Officer Rogers, soon joined by WPD officers in myriad police vehicles, followed the

        SUV through Wilbraham and into the adjacent town of Palmer.

27.     WPD dispatch notified the SPD and the Palmer Police Department ("PPD") of what now

        had become a chase.  The PPD set out deflation devices ("stop sticks") in the SUV's

        oncoming path.

28.     The stop sticks punctured two of the SUV's tires.  The SUV was thus stopped in Palmer,

        where the PPD officers found the vehicle unoccupied with the engine running and two

        doors ajar.

29.     Defendant Rupert Daniel, a captain in the SPD narcotics unit, was the 4-12 duty shif

        supervisor.  Captain Daniel knew that there was no legitimate reason for SPD narcotics

        officers to pursue the stolen SUV outside of Springfield.  On information and belief, he

        also knew or should have known that during his duty shift some of the officers, including

        Officers Bigda and Cournoyers, had been drinking alcohol at the police station.

30.     Captain Daniel knew that Officers Bigda and Cournoyer were overly aggressive officers

        with a history of committing violence against civilians.

31.     Captain Daniel authorized the SPD officers to leave Springfield to obtain the missing

        SUV.  Captain Daniel told Officer Bigda and Vigneault, "You own it but you are on your

        own time."

32.     Captain Daniel should not have permitted SPD officers to go to Wilbraham or Palmer to

        retrieve the SUV or to take custody of prisoners.  It was foreseeable that officers whose

        shift had ended- and who had a personal stake in ending the embarrassment of having left

        their undercover police vehicle idling unattended so it could be taken- would commit

misconduct in this situation.  It was foreseeable that intoxicated police officers would commit misconduct in this situation.

33.   The fact that defendant Officer Bigda was personally affected by the theft increased the likelihood that he would commit misconduct.  Given Officer Bigda's well-known history of using unreasonable force, allowing him to be personally involved in pursuing the SUV created an obvious risk that he would inflict serious harm on the suspects particularly where he was intoxicated.

34.   Defendant John Barbieri was the commissioner for the SPD.   On information and belief, he also knew or should have known that during his duty shift some of the officers, including Officer Bigda, had been drinking alcohol at the police station.

35.   Commissioner Barbieri knew that Officer Bigda was an overly aggressive officer with a history of committing violence against civilians.

36.   Officers Bigda and five other SPD narcotics officers soon arrived in Palmer to join in the pursuit.

37.   Roger Tucker, then the Chief of the Wilbraham Police Department, stated that the SPD officers had no business being on the scene of the arrest.

38.   Matthew Baird of the Massachusetts State Police ("MSP") K-9 Unit heard about the pursuit over the WMLEC channel and arrived at the newly abandoned SUV with his K-9, Caber, who began to track the vehicle's newly departed occupants.

39.   Caber then pulled Trooper Baird towards the side stairs of a porch at 1598 North Main Street, a multi-unit residence.

40.   Plaintiff D.R. was on the porch with minor friends T.J and F.E.

41.   Trooper Baird deployed his K-9 Caber and gave the command to apprehend the boys.

42.     Frightened and startled by the full-sized German Shepherd police dog running towards them, D.R. and F.E. jumped off the porch and ran into North Main Street, Palmer.

43.     K-9 Caber quickly caught F.E., seized him and bit him on his upper left thigh and buttocks while taking him to the ground.  Caber continued to bite him while also biting F.E.'s arm.

44.     WPD Officer Rogers ordered plaintiff, D.R., to lie face down on the ground, place his hands behind his back and the officer proceeded to secure (handcuff) him there.

45.     The SPD narcotics officers then arrived at the scene on foot.

46.     Defendant Officer Bigda came up to the prone and handcuffed plaintiff, D.R., and while screaming "welcome to white town," proceeded to kick the boy multiple times in the face and head with his boot, including the temple area, causing D.R to become dizzy.

47.     Defendant Officer Cournoyer then searched D.R.'s pockets and seized his cellphone.

48.     Defendant Officer Bigda then approached another minor, F.E., who was also prone and handcuffed and lying face down.  Defendant Officer Bigda also kicked him in the face. Officers also punched F.E. in the face with a closed fist.

49.     Plaintiff D.R. was already restrained and lying prone on the roads cold concrete.  He did not resist or pose a threat to anyone's safety.  Defendant Officer Bigda had no legitimate reason to use physical force against D.R.

50.     As a result of being kicked in the face, head and temple area by Defendant Bigda's boot, D.R. had bleeding and there were remnants of the boys blood on Officer Bigda's boot. F.E's blood was also on Defendant Bigda's hand.

51.   As the violence continued, F.E. screamed to plaintiff, D.R., his belief that the police "were going to kill me!"   Defendant Bigda then also spit on F.E. while saying, again, "Welcome to white town, mother—ers."

52.   Nearly an hour later an ambulance arrived to take F.E. to the hospital for treatment for his dog bite wounds.

53.   Police officers took plaintiff, D.R., and another minor, T.J., to the Palmer police station for a 'courtesy booking' for SPD.

54.   SPD officers, including defendants Bigda and Cournoyer, did not inform plaintiff's parents of the arrest or their intent to interrogate him although he was a minor.

55.   SPD officers, including defendant Officers Bigda and Cournoyer, did not offer plaintiff the opportunity to contact his parents although he was a minor.

56.   Plaintiff, D.R. and another minor, T.J., were placed in different holding cells at the Palmer police station.   Defendant Bigda engaged in an interrogation of D.R. for approximately an hour.

57.   Defendant Cournoyer stood silently by while defendant Bigda engaged in the harsh interrogation of plaintiff.

58.   Defendant Cournoyer failed to intervene while defendant Bigda kicked plaintiff, D.R., in the head and temple, and, while he threatened the minor plaintiff in the holding cell without the benefit of Miranda rights or his parents present.

59.   Plaintiff, D.R., was still dizzy while he was interrogated in the holding cell at the police station. At no time did defendants Bigda or Cournoyer offer medical treatment to plaintiff, D.R.

60.   Plaintiff's parents were not present.

61.    Minor plaintiff D.R. was not given his Miranda rights by either defendant Bigda or
       Cournoyer.

62.    The PPD's surveillance system recorded the interrogation in its entirety in video and
       audio.

63.    While defendant Bigda threatened, shouted at and berated plaintiff, D.R.,  a strong and
       overpowering odor of alcohol came from his breath.

64.    At no time during the interrogation of plaintiff D.R, did defendant Officer Cournoyer
       attempt to intervene and help the minor child.

65.    Defendant Bigda stated clearly during this interrogation that he did not in the least care
       about being truthful in his police reporting but would do whatever was necessary to
       inflict retribution for the theft of his unit's vehicle and failure of the juvenile to 'confess'
       to this and other crimes defendant Officer Bigda claimed plaintiff D.R. had committed.

66.    At no time did defendant Officer Cournoyer attempt to interject with defendant Officer
       Bigda as to his proclamations about not caring about being truthful in his police reporting
       or his expressed desire to do whatever was necessary to inflict retribution for the theft of
       his unit's vehicle or the failure of D.R. to 'confess' to this and other crimes defendant
       Bigda claimed plaintiff D.R. committed.

67.    Some of the many statements made to plaintiff D.R. by defendant Bigda where defendant
       Cournoyer stood silently by while failing to intervene included but were not limited to the
       following:

       a.    "Who's the kid at the hospital the dog---oh, look at that! Know what that is?
             That's his mother—ing blood"  [points to the toe of right boot]";

       b.    "you probably don't even know who your father is";

    c.   "wait until you get back to my house;"

    d.   "we're going for a hospital trip for you;"

    e.   "I'm going to crush your f—ing skull and get away with it";

    f.   "I will bring the dog back and let him go at you;"

    g.   "I'll beat the f--  out of you when (we) get back to Springfield;"

    h.   "Anything you say doesn't come true, I find out you're lying…see that [points to right, then left shoe]…that'll be yours on this shoe [meaing blood];"

    i.   "you know what I have in Springfield?  We don't have a nice new department like this.  You know in my department –see that camera up there?  It don't f—ing exist so anything that happens to you at my place never happened.  If I don't write it in a report, it never f—ing happened";

    j.   "Motherf---er, I'll charge you with killing Kennedy and make it stick;"

    k.   "I'm not hampered by the f—ing truth 'cause I don't give a f--!  People like you belong in jail.  I'll charge you with whatever---I'll stick a f—ing kilo of coke in your pocket and put you away for f---ing 15 years;" and

    l.   "I'm gonna kick you right in the f—ing face as soon as we cross the Springfield line."

68.   A graphic thirty-two minute portion of the interrogation by defendant Bigda where he repeatedly berated, threatened and intimidated D.R. while SPD Officer Cournoyer stood Silently by in assent can be found at:

https://www.youtube.com/watch?v=r1i3a0-qhME

69. Still intoxicated, Defendant Bigda and Cournoyer sand other SPD drove plaintiff and the other boys to SPD's Youth Aid Bureau for further processing.

### B. Policies, customs and practices: A history of failing to track, control or discipline for use of excessive force

### a. Failure to supervise or discipline Defendant Officer Bigda

70. Officer Bigda graduated from the police academy and became a Springfield police officer in 1994.

71. From January 2000 until March, 2016, Officer Bigda was the subject of at least 24 internal investigations of misconduct at the Springfield Police Department.

72. Thirteen of the 24 internal investigations involved complaints that Officer Bigda, alone or in concert with other Springfield officers, used excessive force.

73. The allegations of excessive force against Officer Bigda included the following:

   a. Holding a civilians leg against the hot tailpipe of a police cruiser;

   b. Hitting a civilian in the head with a flashlight during an arrest;

   c. Mistaking an innocent man for a suspect, dragging him from his car, handcuffing him and beating him in the head and neck;

   d. Cursing and striking several women, one of whom was pregnant, in the presence of their children;

   e. Grabbing a Chicopee police officer from his unmarked police vehicle, spinning him around, and shoving him against the car door, solely because that officer was a dark-skinned Hispanic male,

f.   Choking, kicking and assaulting the complainant's mentally disable son, breaking his jaw, and pointing a gun at the complainant's chest and stating, "I can't stand Puerto Ricans;"

g.   After the incident set forth in this complaint and on March 12, 2016, defendant Bigda twice staged late-night armed invasions of the home of his former girlfriend, SPD K-9 Officer Gail Gethins. During this home invasion he assaulted her and her boyfriend, Ed Vigneault – who was Bigda's narcotic's unit partner.

h.   Gethins told a district court judge in the Palmer district court in an application for restraining order that Officer Detective Bigda threatened to destroy her and her boyfriend, detective Vigneault.  Gethins wrote in an affidavit Detective Bigda threatened her saying "I am going to kill you " and that she was in fear of her life: "This occurred at approximately 12:30AM. Knowing his history of drinking and owning firearms I am in fear and scare of what he will continue to do."

i.   Shortly after Detective Bigda began texting nasty messages and leaving voice messages to Vigneault and Gethins that said endearing things like: "Hey, Whore! Nice to meet ya… "I'll take care of all you people…". Detective Bigda also threatened Vigneault telling him "I will get you transferred out of the narcotics unit and ruin your career."

74.   On March 12, 2016, defendant Officer Bigda's partner, detective Vigneault, complained to his narcotics supervisor, Lieutenant Alberto Ayala about Detective Bigda's assault, home invasion and making threats.

75.   But instead of ordering an immediate investigation Lt. Ayala dismissed Vigneault's allegations.

14

76.    On March 13th Lt. Ayala told detective Vigneault he would either transfer voluntarily out of the narcotics unit or would be kicked out.

77.    Other complaints against Officer Bigda included allegations of verbal abuse, harassment and destruction of civilian's property.  One complainant alleged that Officer Bigda and other officers maced her puppies, killing them.

78.    In acting as he did, defendant Gregg Bigda could expect that the City of Springfield and Police Commissioner John R. Barbieri would not mount a substantive investigation or impose discipline under the established policy and practice of the City and its policy makers of tolerating drinking on the job, violence against civilians, falsifying police reports and use of excessive force by officers.

79.    Because the SPD's Internal Investigation Unit ("IIU") has long been biased in favor of police officers, none of these at least 24 internal investigations resulted in a sustained finding of wrongdoing against defendant officer Bigda.

80.    At the time of the incident set forth in this complaint, Officer Bigda had not received any discipline, retraining, warning or reprimand for any of his actions as SPD officer.

81.    Officer Bigda was not disciplined for his conduct in this case until after the Palmer police station video, above, was made public.

82.    The Springfield Police Department also did not discipline defendant Officer Bigda for lying in court.  In at least four criminal cases a Superior Court judge found that Officer Bigda provided false testimony/false affidavits in support of search warrants, but the SPD took no action.

83.    In 2017, defendant Bigda applied for promotion to sergeant and defendant Barbieri signed off on his candidacy.

### a.   SPD's policy of allowing civil rights violations by its police officers

84.    The SPD has similarly promoted other officers with criminal or disciplinary histories.

85.    By promoting and so rewarding officers alleged or found to have committed crimes, acts
of violence, civil rights violations, false testimony in affidavits and testimonies before the
court, the SPD sends a message to officers that the department does not take such
misconduct seriously.  Officers in turn feel emboldened to violate civilians' constitutional
rights because the officer know that they will not suffer adverse consequences for doing
so.

86.    Defendant Luke Cournoyer remains employed by the SPD, despite failing to intervene
while the plaintiff, D.R., was abused by defendant Officer Bigda and his civil rights were
so violated.

87.    At all pertinent times defendant Commissioner Barbieri, exercised authority over the
SPD and its officers and was a maker of policy as to the SPD's standards of conduct and
discipline.

88.    At all pertinent times defendant Commissioner Barbieri had the authority to discipline
officers for misconduct, including the power to effectively recommend dismissal, and the
power, authority, and duty to hold officers accountable for use of excessive or unjustified
force, for failure to intervene in the use of excessive or unjustified force and for
misstatements of fact in official reports.

89.    At all pertinent times the Defendants City of Springfield ("City") and Commissioner
Barbieri, knew of their legal duty to train, supervise, monitor and discipline members of
the SPD to observe the rights of persons, including their right to be free from wrongful

conviction and misrepresentation at the hands of police.

90. At all pertinent times the City and Commissioner Barbieri failed to monitor, train, supervise, control and/or discipline SPD officers in reporting, investigation, misrepresentation in reporting and at grand jury with such recklessness, gross negligence and/or actual intent as to manifest deliberate indifference to the rights of persons, including the plaintiff, to be free from malicious prosecution, wrongful conviction and misrepresentation at the hands of police.

91. The use of fabrication, false reporting, misrepresentation with impunity in the SPD was at all pertinent times part and parcel of the general *de facto* policy, custom, practice and usage that gave officers extreme and unwarranted discretion in the use of force without requiring them to account for the same.

92. As a matter of policy Commissioner Barbieri and the City accorded this prerogative to police officers.

93. The City of Springfield allowed an unwritten policy and custom to develop in the SPD of permitting officers- including but not limited to defendant Officer Bigda- to use excessive and unreasonable force, to violate civil rights and to commit misconduct with impunity.

94. The City of Springfield allowed an unwritten policy and custom to develop in the SPD of allowing officers- including but not limited to defendant Officer Cournoyer- to purposefully allow and fail to intervene in another officer's violation of the use of excessive and unreasonable force, the violation of civil rights and the commission of misconduct with impunity.

95. As a matter of policy Commissioner Barbieri and the City of Springfield did not

substantively monitor, assess, or regulate the use of force and the failure of other officer's
to intervene in the use of force by SPD officers but sought to maintain the appearance of
doing so.

96.    As a matter of policy defendants, Commissioner Barbieri and the City of Springfield,
rarely sustained civilian's complaints of police misconduct, including complaints
concerning excessive force.  This policy or custom led SPD officers, including but not
limited to defendant Officers Bigda and Cournoyer, to believe they could violate
individuals' civil rights with impunity because they knew they would not be disciplined
for misconduct.

97.    As a matter of policy Commissioner Barbieri and the City did not initiate inquiry into the
arrest and incarceration of the innocent – no matter how evident his innocence was while
there was a pattern and practice to not pursue exculpatory material, to manipulate falsities
in police reporting and to mislead the grand jury regarding the guilt of an individual..

98.    The policies of not investigating circumstances suggesting manufactured reporting
through falsities or omissions, the manipulating of evidence and false testimony before
the grand jury is evident from the acts and omissions of the City and Commissioner
Barbieri regarding numerous allegations of excessive force in complaints to the SPD and
in suits by the alleged victims.

99.    The SPD did not have a properly functioning internal affairs unit.  The IIU did not
properly investigate allegations of misconduct, including allegations of excessive force,
against SPD police officers.  The IIU was biased toward police officers, favoring their
testimony over that of civilians and ignoring credible evidence of officers' misconduct.

100.   When determining officers' discipline, defendant Commissioner Barbieri considered, in

part, the likelihood of the discipline being sustained based on other cases where suspensions or terminations have been overturned by arbitrators or civil service. Commissioner Barbieri chose not to fire Officer Bigda because the City of Springfield's legal and human resources departments advised him that a firing would not survive an expensive civil service appeal.

101.  Years before the incident, the City of Springfield voluntarily entered into a contract with the police union that prohibited the SPD from bringing disciplinary charges against an officer more than 90 days after the incident or after the date the SPD learned of the potential violation, whichever is later.  Commissioner Barbieri admitted that this provision hindered the Department's ability to discipline officers.  This unreasonably short time period for bringing internal complaints allowed officers to commit misconduct with impunity.

102.  In addition, there have been numerous civil rights lawsuits and complaints against the City of Springfield and police officers that allege physical abuse, serious injuries and or instances of malicious prosecution, false statements and failure to provide exculpatory evidence that have not resulted in any discipline.

103.  Before and after the incident from which this case arises, the defendants City of Springfield and Commissioner Barbieri were aware of complaints and claims alleging use of excessive force and other civil rights violations on the part of the SPD officers, but on information and belief such allegations did not result in substantive investigation into such incidents or discipline of officers.

104.  Upon information and belief, Vigneault also complained in early 2016 that Detective Bigda was allowed to work and drink in the narcotics unit while intoxicated and observed

Detective Bigda and others actively consume alcohol at the police station while working before going out into the field to work and after returning to the police station. *Vigneault v. City of Springfield, et al*, Hampden Superior Court at ¶ 22.

105.    Defendant Commissioner Barbieri was aware of the Officer Gethins home invasion because on March 15th Deputy Chief Anthony who worked closely with Commissioner Barbieri told Vigneault he would be kicked out of the narcotics unit if he did not transfer.

106.    On October 28, 2016, defendant Commissioner Barbieri claimed that he was unaware of the assault of the Springfield juveniles in Palmer until he was contacted by the Hampden District Attorney's office during June 2016.

107.    In a different affidavit signed on February 2, 2017, defendant Commissioner Barbieri affirmed he was aware of the Palmer incident immediately after it happened and claimed when he learned of the incident there no charges of misconduct other than a verbal reprimand.

108.    Instead of firing defendant Officer Bigda for engaging in criminal and gross misconduct, suspended Detective Bigda for 60 days after trivializing Bigda's prior disciplinary history and describing the Gethins assault and home invasion euphemistically as a "trespass."

109.    Barbieri wrote: "Detective Bigda's acceptance of responsibility for improper behavior, his previous lengthy employment without recent serious disciplinary (sic) a recent incident involving a trespass during a domestic argument which occurred shortly after this incident (which resulted in discipline and counseling); the likelihood of sustaining discipline based on other cases where suspensions have been overturned or civil service…"

110.    But in a February 2017, affidavit related to the Vigneault lawsuit, Barbieri characterized

Detective Bigda's home invasion and assault of Gethins and Vigneault quite differently "a recent incident involving a B&E/misdemeanor during a domestic argument which occurred shortly after this incident (which resulted in discipline and counseling)…"

111.   Barbieri justified the lax disciplinary deal he approved in favor of detective Bigda by stating: "Additionally Detective Bigda was departmentally transferred from his position" intimating his duties were restricted to desk duties when in fact Bigda continued to patrol the streets in Springfield for a period of time.

112.   Barbieri and the City pressured detective Vigneault into resigning from the SPD or be fired because Vigneault did not have the internal connections Bigda had.

113.   Vigneault filed a whistle blower and a civil rights lawsuit in Hampden Superior Court against Barbieri, Detective Bigda and others alleging he had been removed from the narcotics unit and improperly fired after he complained about Detective Bigda for engaging in criminal conduct, i.e. assaulting him and Gethins after a home invasion, drinking and intoxication in the narcotics unit while on duty and violating the civil rights of juveniles in Palmer.

114.   But Barbieri knowingly made a number of misleading claims in connection with the affidavit he prepared in the Vigneault lawsuit.  Barbieri claimed a) he was unaware Vigneault was a whistleblower, b) Detective Bigda enjoyed no "special influence" in the narcotics unit or in the SPD, c) he was unaware narcotic officers were drinking on the job.

115.   Barbieri claimed an additional IIU investigation was ordered for corroboration of drinking on the job in the narcotics unit. According to Barbieri "The results of that investigation did not turn up any corroboration from any source either inside or outside

the department. This investigation included all of the individuals working in the narcotics unit and all of the non-Springfield law enforcement officer involved in the February 2016 incident."

116. But all of the detectives from the narcotics unit that were questioned for "corroboration" have stated in federal depositions, they are close, like, admire, respect and have no criticism of Detective Bigda.

117. Barbieri's assertions were not only misleading but they reinforce the widespread existence of a code of silence and a culture of impunity from the rank and file all the way up to his office.


118. SPD officers in the narcotics unit had a large number of complaints that were determined to be unfounded by the SPD:

- Detective Bigda had twenty-six (26) civilian complaints

- Lt. Kent had twenty-three (23) civilian complaint

- Detective Templeman had thirty (30) civilian complaints

- Detective Kalish had twenty (20) civilian complaints

- Detective Patruno had nine (9) civilian complaints

- Detective Kakley had thirteen (13) civilian complaints

- Detective Bates had twelve (12) civilian complaints

119. Defendant Officer Bigda and other members of the SPD narcotics unit were sued in federal court by an arrestee who claimed he was punched after being handcuffed, pistol whipped, and his girlfriend slapped in the face by one of the officers. *Douglas v. City of Springfield, Bigda et al.,* 3:14-cv-30210.

120.  Discovery in *Douglas v. Springfield the City, et al,* that Detective Bigda and his
      codefendants had been subject of approximately 133 complaints none of which were ever
      sustained.

121.  In 2016 the City of Springfield filed with the United States Federal Court a motion for
      summary judgment in Douglas v. City of Springfield, et al, 3:14-cv-30210 claiming that
      the City of Springfield should not be held liable because Mr. Douglas had failed to
      demonstrate a well settled and widespread pattern of police misconduct to show the City
      had constructive knowledge of it.

122.  City lawyers argued there was no evidence that Springfield had been deliberately
      indifferent to the rights of it citizens.

123.  But on October 14, 2016 the Honorable Katherine A. Robertson, U.S. Magistrate Judge
      in a Report and Recommendation Regarding Defendant's [City of Springfield] Motion
      for Summary Judgment, denied Springfield's motion stating: "A reasonable finder of fact
      could also infer that there were flaws in the city's investigation of civilian complaints that
      demonstrated deliberate indifference to the risks posed by officers against whom large
      number of civilian complaints about excessive use of force had been made."

124.  Judge Robertson also opined "The IIU ("Internal Investigating Unit") submitted as
      evidence by Plaintiff show what appears to be a consistent pattern of rejecting civilian
      complaints against police officers." (citations omitted).  Judge Robertson also concluded
      "Taking these factors into account, a reasonable finder of fact could conclude that
      Springfield's investigative process was less than effective at identifying officers prone to
      the use of excessive force."

125.  Finally, she concluded "Because Plaintiff claims to have been the victim of excessive use

of force during the execution of an arrest warrant, he has "produce[d] evidence that serious prior incidents similar to the alleged constitutional violation in question put the municipality on inquiry notice of [the officers'] danger to the public and that the police department's policy of ignoring or covering up those incidents was 'the moving force' behind the alleged violation."

126. On or about December 2016, the City of Springfield agreed to pay $1.4 Million to a an individual in Charles *Wilhite v. City of Springfield* USDC-MA Case No. 3:14-cv-30023KPN, after he filed a federal civil rights lawsuit alleging that on December 2010 he was convicted of first degree murder based solely on false eyewitness testimony. The witnesses according to the complaint, recanted and revealed detectives Pioggia and Tatro of the SPD threatened and coerced them to implicate Mr. Wilhite who spent 40 months in prison.

127. After the filing of *nolle prossequis* on all of the indictments against Schand on October 16, 2013, the City of Springfield and a group of former detectives were sued with allegations that Mark Schand was wrongfully incarcerated for 27 years "as a direct result of doctored and suppressed police reports, coerced and unreliable witness statements, improper identification procedures, and a general pattern of blatant disregard for the law on the part of the Defendants, … Shand… spent 27 years in prison for murder, assault and robbery he did not commit. Arrested at the age of 21, Plaintiff was wrongfully convicted and sentenced to life in prison without the possibility of parole. *Schand et al, v. City of Springfield, et al*, USDC-MA Case No. 3:15-cv-30148MAP, Document 1, 8/20/2015.

128. The complaint also alleges "The City of Springfield and the SPD also withheld and

doctored key exculpatory evidence."

129. In *Ververis et al v. Kent et al.*, U.S. District Court, District of Massachusetts, Docket No.
3:13:-cv-30175, a civil rights case filed October 22, 2013, the plaintiff alleged that, in
response to a request for Sgt. Kent's badge number, that Kent and three other SPD
officers dragged him from his vehicle, beat him, and choked him until he was
unconscious. He also alleged one of the officers kicked and dragged his body on the
snow-covered ground.

130. The Ververis suit also alleged that Sgt. Kent countenanced the unlawful seizure of a cell
phone a bystander had used to record the incident, and that when police returned the cell
phone to its owner months later the recording had been erased.

131. In a ruling of January 15, 2015, denying the City's motion for summary judgment dismiss
Ververis' claim alleging unconstitutional conduct by the City was a cause of the incident,
the federal  Court held:  "There are sufficient disputed issues of fact to support Plaintiff's
claim that the violation of his civil rights stemmed from an established custom and policy
of the City of Springfield."

132. Springfield agreed to pay Ververis $175,000 to compensate him for his injuries.

133. In *Owens v. Sullivan et al* USDC Docket No. 3:12-cv-30119, filed on April 9, 2013, a
federal court jury determined that an SPD officer's use of excessive force on a 15 year
old minor (lunging at him and grabbing his neck for failing to hang up his cell phone)
which caused the boy's death when he was struck and pinned under a car while trying to
avoid the officer.

134. The jury verdict of September 22, 2014 came with a damages award of $1,262,000. No
one was disciplined as a result of Walker's death.

135. In *Thomas v. City of Springfield et al.,* USDC 3:97:cv-30166, filed May, 13, 2010, the
plaintiff alleged that SPD officers – including Sgt. Kent,  Detective Templeman,
defendant Officer Bigda, and Detective Patruno – removed him from his vehicle, pulled
his pants down in the middle of the street, kicked and punched him over his entire body,
then strip searched and beat him again at the police station.

136. In another criminal case, *Commonwealth v. Reyes,* a Hampden Superior Court Judge
(Page, J), held a Franks hearing to determine if Officer Templeman, a narcotics officer,
had provided false testimony in an affidavit to obtain a search warrant.

137. Justice Page suppressed evidence out of the case after finding that detective Bigda and
Templeman had given false testimony about the movements of a defendant.  See
Commonwealth v. William Reyes, Hampden Superior Court, HDCR2007-00281.

138. Specifically, Templeman attempted to bootstrap probable cause by fabricating
observations of the whereabouts of Mr. Reyes that were later discredited because Mr.
Reyes's Court electronic monitoring transmitter (ELMO) contradicted Templeman's false
testimony i.e. the ELMO records established that at the time Templeman made his
observations of Reyes, Reyes had gone out of range of his box for an hour and twenty
minutes before Detective Templemen claims to have made his observations.

139. None of the officers criticized by Judge Page were disciplined or retrained.

140. *Baldwin v. Ryan et al.*, USDC Docket No. 3:07-cv-30167, filed September 10, 2007,
alleged that an African American male was beaten "brutally upon the head face and body
by three white police officers" while he was handcuffed.

141. *Lewis v. Springfield et al.*, USDC Docket No. 3:02-cv-30027, filed on May 14, 2003.
October 22, 2013, accused Sgt. Kent and other SPD officers of violating the civil rights

of a driver who alleged he was dragged from his car, thrown against the vehicle, told "he was being taken to a special place to get his ass kicked," and was then taken to the police station and strip searched.

142. On information and belief, none of the foregoing allegations of SPD officers' violation of civil rights resulted in any action to correct or review their conduct, either by way of genuine scrutiny under professional standards of investigation or by discipline.

143. In *Melvin Jones v. City of Springfield, et al.,* USDCT-Dist. Mass. Case No. 3:10-cv-30244-MAP, Doc. 51, 6/6/2011 Mr. Jones claimed Officer Asher and others were videotaped beating him after they slammed him into the hood a police cruiser. He alleged being kicked in the groin and back and was viciously struck in the head with a metal flashlight in 2009 while one of the officers called him a "Nigger."

144. Melvin Jones who was beaten by Officer Asher with a flashlight suffered broken facial bones and partially lost vision in one eye from an estimated 20 blows to the head.

145. None of Officer Asher's associates stopped Jones' beating.

146. Jones brought civil rights claims not only against Asher but against the City, claiming the beating happened because of an unconstitutional policy of failing to train, supervise, and discipline officers for violent misconduct was a cause of the beating.

147. The City of Springfield settled Jones' suit for $575,000 in 2012.

148. During the discovery period in the Jones case, SPD Police Commissioner William J. Fitchett gave a deposition about the practices of the SPD including an eighteen year period in which he investigated officers for the alleged use of excessive force and how he was the final authority in those cases.

149. A video tape of Jones arrest and beating was captured by a Springfield resident and was

given to Masslive.

150. Without the existence of the videotape no one would have been disciplined by the City. This demonstrates the existence of a code of silence.

151. Two of the participants in Jones' beating, officers Michael Sedergren and Theodore Truiolo testified during the criminal trial on Asher's behalf defending his actions.

152. At trial Sedergren, testified he yelled for fellow officers to hit Jones because he was sure Jones was reaching to take his gun out of his holster.

153. Asher was found guilty and spent a year in jail on a criminal assault conviction.

154. Fitchett concluded after reviewing a video that Asher used deadly force that should not have been used.

155. Fitchett concluded that when Officer Asher struck Mr. Jones with a flashlight the strikes were not only inconsistent with the baton policy because there were too many strikes directed at an area "[T]hat was a very dangerous area to strike someone at. I believe those number of strikes in the area that the strikes were made was inappropriate, and that Officer Asher used force that was not necessary in order to effect the arrest." Id. at 108, lines 6-12.

156. Fitchett testified that all of the officers involved in the arrest of Melvin Jones invoked their Fifth Amendment rights against self-incrimination, i.e., Asher, Sedergren, Lt. Bobianski, Officer Truiolo and they never gave statements to the IIU officers that Fitchett assigned to investigate the incident. Id. at 113, lines 1-22.

157. Despite their refusal to answer questions during an IIU investigation, Lt. Bobianski, Sedergren and Truiolo continue to be employed by the SPD, i.e. Fitchett suspended Bobianski for 45 days without pay, Officer Truiolo for 15 days.

158.    Barbieri's and the  City's refusal to fire these employees demonstrates gross negligence
        and deliberate indifference to the rights of Springfield citizens.

159.    Fitchett admitted in his deposition that Officer Asher "…[H]ad a lot of disciplinary
        complaints" prior to the Melvin Jones incident.  Transcript, p. 160: 8-23, p. 161:1. A
        prior civilian complaint was filed against Officer Asher. That other complaint alleged
        excessive force by Asher against an African American arrestee (Roy Parker) which
        resulted in a one year suspension reduced to six month through arbitration.  Id. at 161,
        lines 6-23, pp. 162, lines 1-12.

160.    Fitchett admitted Asher kicked Roy Parker in the shoulder while two police officers were
        on top of him. Trans. at 167: 21-23, 168:1-8.

161.    Fitchett identified in his deposition the booking photo of Melvin Jones which depicted
        visible injuries. Trans. 169, 4:23, p. 170:1-17.

162.    Fitchett testified he was aware Jones sustained a fracture around his sinus and an orbital
        wall fracture and had surgery. Trans. 171:12-19

163.    Fitchett acknowledged during his deposition that Officer Asher had been charged with
        multiple disciplinary complaints that alleged excessive force (threats of force) and other
        disciplinary concerns. Some of them resulted in discipline and others did not.  Id. 175,
        lines 2-23, pp. 176, lines 1-23, pp. 177, lines 1-23, pp. 179, lines 7-22., pp. 180, lines 12-
        16. See also, pp. 182, lines 7-16 and pp. 184, lines 8-23, pp. 188, lines 2-9, pp. 188, lines
        15-23, pp. 189, lines 1-17, pp. 196, line 5-19, pp. 198, lines 8-198.

164.    Fitchett acknowledged Asher was not disciplined or terminated for other incidents, one in
        which he allegedly hit the principal of a charter school on the head with an object while
        he was on the ground even though the City of Springfield paid the Plaintiff in that case

(Douglas Greer) the sum of $180,000. Id. at 198, line 8-23, pp. 199, lines 1-23, pp. 200, 1-23, pp. 201, lines 1-23, pp. 204, lines 8-23, pp. 205, lines 1-23, pp. 206, lines 1-23.

165.   Fitchett testified the internal affairs hearing board uncovered evidence during the investigation indicated to him that the officers that came in contact with Melvin Jones (Asher, Sedergren, Truiolo, Bobianski) were guilty of either misconduct, neglect of duty in regards to the performance of duty.

166.   The City of Springfield's conduct in failing to, supervise, and discipline its officers to assure they used force appropriately and lawfully was a moving force behind the SPD officer defendants' unlawful assault upon the plaintiff in violation of his civil rights as complained of herein.


**Plaintiff's Damages**


167.   As a direct and proximate result of defendants' conduct as set forth herein, plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering and other grievous and continuing injuries and damages.

168.   D.R. suffered from dizziness due to blows to his head and temple, anxious and angry mood, fear for his safety and fear of any encounter with other officers.

169.   Plaintiff spent eight months of the prime of his life in the house of correction.

170.   Plaintiff was deprived of opportunities to engage in education, meaningful labor, to develop a career and to pursue his interests and passions, or to associate with friends and family and instead endured the tedium, isolation, and forced association with accused and/or convicted criminals.

171.  Because of defendants' misconduct, D.R. has been deprived of all basic of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

172.   Defendants are jointly and severally liable for violating plaintiff's rights under the Constitution of the Commonwealth of Massachusetts and under the United States Constitution and for all injuries he sustained as a result of the constitutional violations.

## COUNT I

## 42 U.S.C. § 1983: Failure to Discipline, Supervise

## City of Springfield, Barbieri

173.  Each of the foregoing paragraphs is incorporated as if fully set forth herein.

174.  Prior to February 26-27, 2016, and continuing, the Defendant, City of Springfield and its policy makers (Barbieri) have maintained customs, policies and practices that evince deliberate indifference to the rights of citizens that come in contact with members of the police department.  The likelihood of infringement of citizens' rights resulting from the said customs, policies and practices was so obvious these defendants were either aware of it, or if they were not their ignorance was due to deliberate indifference to the use of police power to abridge constitutional rights.

175.  The City of Springfield and its policymakers at all pertinent times failed to maintain a minimally appropriate supervisory and disciplinary systems for its officers in key areas of law enforcement including requiring officers to file truthful police reports, use of unreasonable force and failure to intervene against the use of unreasonable force.

176.  As a direct and proximate result thereof, the plaintiff suffered the losses and injuries

described herein.

## COUNT II

### 42 U.S.C. § 1983: against Defendant Officer Bigda

177.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

178.    Defendant Officer Bigda, acting under color of law, used unreasonable force against minor Plaintiff D.R., thereby depriving him of his clearly established right to be free from the use of unreasonable force by a police officer under the Fourth Amendment to the United States Constitution, as applied under the Fourteenth Amendment.

179.    Defendant Officer Bigda violated plaintiff D.R.'s constitutional rights.

180.    Defendant Officer Bigda acted with reckless disregard for plaintiff D.R.'s constitutional rights.

181.    As a direct and proximate result thereof, the plaintiff suffered the losses and injuries described herein.

## COUNT III

### 42 U.S.C. § 1983: against Defendant Officer Cournoyer

182.    Each of the foregoing paragraphs is incorporated as if fully set forth herein.

183.    Plaintiff, D.R., contends that Officer Bigda, acting under color of law, used unreasonable force against minor Plaintiff D.R., thereby depriving him of his clearly established right to be free from the use of unreasonable force by a police officer under the Fourth Amendment to the United States Constitution, as applied under the Fourteenth Amendment and that defendant Luke Cournoyer failed to intervene to stop the violation.

184.    Defendant Officer Bigda violated plaintiff D.R.'s constitutional rights and defendant

Officer Luke Cournoyer failed to intervene to stop the violation.

185.  Defendant Officer Bigda acted with reckless disregard for plaintiff D.R.'s constitutional rights and defendant Officer Luke Cournoyer failed to intervene to stop such reckless disregard for plaintiff's constitutional rights.

186.   As a direct and proximate result thereof, the plaintiff suffered the losses and injuries described herein.


## COUNT IV

## 42 U.S.C. § 1983: against Defendant Daniel

187.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

188.   Defendant Daniel knew that allowing Defendant Officers Bigda and Cournoyer with other SPD officers to leave Springfield to retrieve the missing SUV, under the circumstances described above, posed a substantial risk of serious harm to anyone apprehended for the theft.  As the officers' supervisor, he had the ability and the duty to prevent the officers from becoming involved in the pursuit.  Instead, he authorized that pursuit.

189.   Defendant Daniel was deliberately indifferent to the obvious risk that Defendant Officer Bigda would use unreasonable force against anyone suspected of stealing the police SUV.

190.   Defendant Daniel was deliberately indifferent to the obvious risk that Defendant Officer Bigda would use unreasonable force against anyone suspected of stealing the police SUV and that defendant Luke Cournoyer would fail to intervene in the use of unreasonable force meted out by defendant Officer Bigda.

191.    As a direct and proximate result thereof, the plaintiff suffered the losses and injuries

described herein.

## DEMANDS FOR RELIEF

The Plaintiff respectfully requests the following relief:

1.      All compensatory damages recoverable;

2.      Injunctive relief;

3.      All punitive damages recoverable against Defendants Bigda and Daniel;

4.      All attorney's fees, costs and expenses allowable;

5.      Any and all other relief as the Court deems just and proper.


**PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL COUNTS IN THE COMPLAINT**



Respectfully submitted,
Plaintiff,  D.R.
By his attorneys,

_____

/s/ *Jeanne A. Liddy*
Jeanne A. Liddy BBO # 646478
Law Offices of Jeanne A. Liddy
1380 Main Street, Suite #404
Springfield, MA 01103
Tel. (413) 781-7096
Liddylaw2005@yahoo.com

_____

_____
/s/ Tracy E. Duncan
Tracy E. Duncan, Esq. BBO#553846
1380 Main Street, Suite #404
Springfield, MA 01103
Tel. 746-8441
TcDunc@aol.com

DATED: June 10, 2020