# Investigation of the Springfield, Massachusetts Police Department's Narcotics Bureau



United States Department of Justice
Civil Rights Division
and
United States Attorney's Office
District of Massachusetts

July 8, 2020

# EXECUTIVE SUMMARY

On April 13, 2018, the United States Department of Justice initiated an investigation of the Springfield Police Department's (SPD, or "Department") Narcotics Bureau, pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601.[1]  The Narcotics Bureau is a small unit of SPD plainclothes officers tasked with enforcing drug-related laws. Following a thorough investigation, there is reasonable cause to believe that Narcotics Bureau officers engage in a pattern or practice of excessive force in violation of the Fourth Amendment of the United States Constitution.[2]

Specifically, our investigation identified evidence that Narcotics Bureau officers repeatedly punch individuals in the face unnecessarily, in part because they escalate encounters with civilians too quickly, and resort to unreasonable takedown maneuvers that, like head strikes, could reasonably be expected to cause head injuries.

This pattern or practice of excessive force is directly attributable to systemic deficiencies in policies, accountability systems, and training.  For example, unlike most other police departments, SPD policies do not require officers to report "hands on" uses of force such as punches and kicks.  This practice enables Narcotics Bureau officers to routinely avoid reporting any use of hands-on force or to submit vague and misleading reports documenting their uses of force.  We also found examples where Narcotics Bureau officers falsified reports to disguise or hide their use of force.  Supervisors fail to effectively review uses of force that Narcotics Bureau officers do report.  Deficiencies within SPD's broader systems of accountability exacerbate these issues.  For example, although SPD policy requires that senior command staff refer to SPD's Internal Investigations Unit (IIU) any questionable force incident resulting in injury, from 2013 to 2018, command staff did not make any referrals in cases involving the Narcotics Bureau; indeed, not a single such referral was made throughout the entire Department.  Further, while IIU has investigated some excessive force complaints made by members of the public, its investigations lack critical content needed to determine if an allegation should be sustained.  This has resulted in zero sustained findings of excessive force against any Narcotics Bureau officer in the last six years.

Against this backdrop, Narcotics Bureau officers engage in uses of excessive force without accountability.  For example, in October 2018, the United States indicted a veteran Narcotics Bureau sergeant for color of law violations related to his 2016 arrest of two juveniles. The indictment alleges that the sergeant kicked one of the youths in the head, spat on him, and said, "welcome to the white man's world."  Further, the sergeant allegedly threatened to, among other things, crush one of the youth's skulls and "fucking get away with it," "fucking bring the dog back [and] let him fucking go after" a youth, "fucking kill [one of the youth] in the parking lot," charge a youth with a murder and "fucking make it stick," and that he would "stick a

---

[1]      The investigation has been conducted jointly by the United States Attorney's Office for the District of Massachusetts and the Special Litigation Section of the Civil Rights Division.

[2]      The Department of Justice does not serve as a tribunal authorized to make factual findings and legal conclusions binding on, or admissible in, any court, and nothing in this Report should be construed as such.  Accordingly, this Report is not intended to be admissible evidence and does not create any legal rights or obligations.

fucking kilo of coke in [one of the youth's] pocket and put [him] away for fucking fifteen years." The indictment also alleges that during interrogation, the sergeant "pointed to blood on his boot" and told one of the youths that if he lied, the youth's "blood would be on [the sergeant's] boot next."  The case is pending.

Moreover, there is reasonable cause to believe that officers use excessive force even more often than our investigation uncovered.  Indeed, we identified evidence that officers underreport force that should be documented even under SPD's minimal reporting standards.  In many of these cases, the evidence that is available suggests the force used may have caused serious injury and may have exceeded the level of force justified by the circumstances of the incident.

This report is based on a comprehensive review of over 114,000 pages of SPD's incident reports, investigative reports, policies, training materials, and other internal documents; interviews with SPD officers and City officials; and interviews with community members.  Our investigation was conducted with the assistance of two law enforcement experts, one of whom served as a narcotics unit officer in a Massachusetts city, and both of whom have extensive experience reviewing use-of-force incidents and analyzing internal affairs investigations.

We appreciate the cooperation and professionalism that City officials, SPD command staff, and many hard-working SPD officers demonstrated throughout our investigation.  We understand that SPD officers perform an immense service to the Springfield community that often places them in dangerous situations, and that Narcotics Bureau officers in particular are tasked with serving felony warrants and making arrests of individuals suspected of serious drug and weapons offenses.  We hope that everyone in Springfield—City officials, SPD officers, and residents alike—will view this report as an opportunity to positively address failures within the Narcotics Bureau and make policing in Springfield lawful, safer, and more effective.

## I.     BACKGROUND

### A.  Springfield, Massachusetts

According to 2010 census data, Springfield is the third largest city in Massachusetts, with a population of over 153,000.  Springfield's population is approximately 52% white, 36% Hispanic or Latino, 22% Black, and 2% Asian.  The median income in Springfield is $34,628, which is below the national average of $49,445.  Approximately 27% of the population lives in poverty, with 43% of Latino residents, 27% of Black residents, and 19% of white residents living below the poverty line.

Springfield is governed by an elected Mayor and City Council.  The current Mayor, Domenic Sarno, is a former Springfield City Councilman who has been Mayor since 2007.  The Springfield City Council is composed of eight members representing each of Springfield's eight wards, and five at-large members.  The Council is led by President Justin Hurst and Vice-President Marcus Williams.

### B. Springfield Police Department

SPD has approximately 500 sworn officers.  The Department is led by a police Commissioner, whom the Mayor appoints to a four-year term.  Cheryl Clapprood, the current Commissioner, is a 40-year SPD veteran who was appointed by the Mayor in September 2019. The Department is organized into three major divisions:  South/Investigations Division, Central/Uniform Division, and North/Administrative Division.  Each division is headed by a deputy chief, who reports to the Commissioner.  Together, the divisions cover nine geographic patrol areas, or "sectors," as well as a number of different specialty units.

The Narcotics Bureau,[3] which falls under the purview of the South/Investigations Division deputy chief, is a small unit of SPD plainclothes officers tasked with apprehending those suspected of narcotics offenses and executing narcotics search and arrest warrants.  The Narcotics Bureau also includes the Vice Unit, the Warrant Apprehension Unit, the Task Force (which includes several officers assigned to regional federal and state drug task forces), the Property Unit, and Licensing.  Fully staffed, the unit consists of 24 officers, three sergeants, one lieutenant, and one captain, who oversees the unit.

The Internal Investigations Unit (IIU) is charged with investigating allegations of misconduct against the Department and its employees.  The IIU is staffed by a captain, lieutenant, and three sergeants.  While the IIU conducts investigations of allegations of officer misconduct and drafts reports summarizing findings of fact, IIU investigators *do not* weigh evidence, draw conclusions, or recommend findings.  Rather, IIU presents its reports to the Commissioner, or, in the case of certain types of civilian complaints, the Community Police Hearing Board (CPHB or Board), a seven-member civilian panel of mayoral appointees intended to bring community input to SPD's internal investigation and discipline process.  For those complaints, a subset of CPHB members review each IIU file to determine whether to make findings and disciplinary recommendations on the basis of the file alone, or whether to hold a hearing.  Where they occur, CPHB hearings are conducted like trials, with city solicitors acting as prosecutors and union counsel defending accused officers.  Regardless of whether or not there is a hearing, CPHB members make recommendations about the complaint's disposition and an officer's discipline to the Commissioner, who is the ultimate decisionmaker on both whether the complaint is sustained and, if so, how much discipline is imposed.[4]

---

[3]     SPD called this bureau the "Narcotics Unit" until approximately 2011, when Commissioner Fitchett renamed it the "Special Investigations Unit."  In September 2019, Commissioner Clapprood renamed the "Special Investigations Unit" as the "Narcotics Bureau."  While the title of this unit has changed, the core functions and responsibilities of this unit have not.

[4]     Under the Executive Order that created the CPHB on February 3, 2010, the CPHB had the authority to make a recommendation for any discipline warranted.  On March 2, 2016, the Executive Order was amended to eliminate CPHB's authority to make discipline recommendations.  The CPHB could only make written findings of fact regarding the merits of the complaint and make a recommendation as to whether any discipline was warranted.  The Executive Order was amended again on December 29, 2017 to reinstate CPHB's authority to make discipline recommendations.  CPHB currently relies on guidance from the City's Department of Labor Relations in making disciplinary recommendations.

Two unions represent the interests of SPD supervisors and officers.  The International Brotherhood of Police Officers represents the interests of patrol officers.  The Springfield Police Supervisors Association represents the interests of sergeants, lieutenants, and captains.  Each union has a collective bargaining agreement (CBA) with the City that establishes the terms and conditions of employment.  In July 2018, the City Council approved a new CBA negotiated by the patrol officer's union and the City.  The supervisors' union CBA was tentatively approved by the union and the City in March 2019.  The recently negotiated contracts include the initiation of a body-worn camera pilot program, the adoption of a social media policy, a peer support program, as well as several provisions related to promotions, evaluations, and discipline.

## C.   Recent Events In the Narcotics Bureau and SPD

Several recent incidents have raised public concern regarding force and accountability issues within SPD, and within the Narcotics Bureau in particular.  As discussed above, a Narcotics Bureau sergeant was indicted for threatening juveniles in a February 2016 incident.  In addition to the federal criminal charges filed against this officer, one of the youths filed a civil lawsuit alleging that the officer used excessive force against him.  The lawsuit alleges officers beat the youth so severely that he received a fractured nose, two black eyes, and numerous head contusions and abrasions.  The sergeant who threatened the youths initially received a 60-day suspension for the incident, but SPD suspended him without pay after he was criminally indicted by a federal grand jury in 2018.  The civil lawsuit against the City and the criminal charges against the sergeant are both still pending.  As a result of this controversy, local prosecutors have had trouble successfully prosecuting drug crimes in Springfield, in large part due to the fact that they have not been able to rely on testimony from discredited Narcotics Bureau officers.[5]

While this investigation focused on the Narcotics Bureau, our conclusions about that Bureau are supported by SPD's response to its officers' uses of excessive force generally.  In one incident, six off-duty SPD officers not assigned to the Narcotics Bureau fought with four men in a parking lot outside a bar in April 2015.  The officers reportedly caused significant injuries to the men, including knocking one unconscious and fracturing his leg and skull, kicking and punching another while he lay on the ground covering his bleeding face, and kicking a third man in the head repeatedly.  The Massachusetts Attorney General's Office has criminal charges pending against several then off-duty and then on-duty SPD officers; charges include both assault and battery and that some officers covered up the incident by providing false reporting.  The alleged beating of civilians outside a bar and alleged willingness of officers to cover up fellow officers' misconduct demonstrate accountability lapses within the Department.  With the charges pending, SPD reinstated to full service five officers in April 2020.

---

[5]      *See, e.g.*, Buffy Spencer, *Drug Cases Dropped Against Springfield Couple; Hinged on Police Officer Gregg Bigda*, MassLive, Jan. 23, 2017; available at http://www.masslive.com/news/index.ssf/2017/01/drug_cases_dropped_against_spr.html; Buffy Spencer, *Prosecution Problems Caused by Suspended Narcotics Detective Gregg Bigda Result in 'Gift' Sentence*, MassLive, Oct. 15, 2016, available at https://www.masslive.com/news/2016/10/prosecution_problems_caused_by.html; Buffy Spencer, *Yet Another Drug Trafficking Case Dropped Because of Springfield Officer Gregg Bigda's Involvement*, MassLive, Dec. 9, 2016, available at http://www.masslive.com/news/index.ssf/2016/12/another_drug_tarfficking_case.html.

In another widely reported incident, a former Narcotics Bureau evidence officer was indicted in January 2016 for stealing cash from the narcotics evidence room. The stolen cash allegedly was obtained from more than 170 drug cases and totaled almost $400,000. The officer was a 43-year-veteran of SPD, and at the time of his retirement in July 2014, was the longest-serving officer in SPD. The officer died before this matter could be resolved legally or administratively.

The City and SPD have taken some steps to address matters within the Department. First, after the 2016 indictment of the Narcotics Bureau evidence officer for theft, SPD requested a City-led audit of SPD's record-keeping practices. The audit found that the Department lacked comprehensive policies or procedures related to seized cash and its disposition; had an inadequate system for logging and tracking seized cash; and had not developed any safeguards to protect against improper access or handling of currency. The audit report recommended several measures, most significantly updates to SPD's record-keeping system for seized cash that SPD has implemented.

Second, the City hired a consultant to review SPD's accountability systems, as well as all SPD policies. This review focused on protocols and did not include a review of any use-of-force incidents or internal investigation files. In early 2019, the consultant issued its first report,[6] which addressed accountability, finding that although SPD has some practices in place regarding complaint intake, classification, and investigation, the practices are not comprehensive or codified appropriately in policy. The report recommended that IIU create a detailed internal affairs manual outlining the process for receiving, investigating, and resolving complaints. It also recommended that IIU create an updated electronic case management system to document and track complaints. The report further recommended improvements to the CPHB by expanding the Board from seven members to at least nine, staffing the Board with individuals who have relevant police and trial experience, and appointing an oversight coordinator that would be responsible for the daily administration of the Board. The City and SPD have publicly committed to implementing these reforms. To date, SPD has revised its IIU policies and added a captain to oversee IIU. In addition, the City added an additional CPHB member, bringing the total to eight members, and allocated additional resources to the CPHB.

Although SPD's and the City's efforts to address weaknesses in its policies and accountability systems is an important first step in the reform process, more is required to address the constitutional violations and systemic deficiencies detailed in this report.

---

[6] The second report, on policies, remains in progress.

## II.      METHODOLOGY

This investigation relies on several sources of information.  We interviewed City officials, SPD's current and former command staff, SPD officers, and other stakeholders within the City of Springfield.  We conducted onsite tours in April 2018, August 2018, December 2018, February 2019, and May 2019.  We also met with SPD's Training Division, IIU investigators, and representatives of the patrol officer and supervisor unions.  A significant portion of each of these interviews consisted of understanding how use-of-force policies are interpreted and applied by commanders and officers in practice.

Although we attempted several times, we did not individually interview any Narcotics Bureau commanders or officers currently serving within the Narcotics Bureau.  SPD informed us that Narcotics Bureau command staff and officers were unwilling to engage in one-on-one interviews with us.  We did, however, conduct a group interview with Narcotics Bureau supervisors.  We also met informally with several groups of Narcotics Bureau supervisors and officers to inform them of our investigation and learn about general Narcotics Bureau operations. In all, we spoke to over 40 SPD officers and command staff.

We also sought to learn more from individuals and groups who have had direct interactions with Narcotics Bureau officers.  We held community meetings in different regions of the City; met with individuals who had either witnessed, had knowledge of, or had been subjected to force by SPD officers; met with plaintiff's attorneys and criminal defense lawyers; spoke with attorneys in the Hampden County District Attorney's Office and FBI agents working cases in the Springfield area; and spoke to over 50 religious leaders and community stakeholders. We also met with the majority of CPHB members.

This investigation also included an extensive review of documentary evidence.  We reviewed over 114,000 pages in total, including SPD's policies and procedures; training materials related to the use of force and accountability; SPD internal affairs protocols; and other materials relating to the general operations of the Department and use-of-force practices in particular.  We also reviewed over 100 report files for over 100 internal investigations conducted by IIU, as well as 74 personnel files.

Most significantly, the investigation included a comprehensive review of officer reports regarding specific incidents in which an SPD officer used force.  There is no single report used to document force within SPD.  Rather, officers use three main types of documents to record force – (1) the "Prisoner Injury File," (2) the "Arrest Report," and (3) the "Use-of-force Report" – each of which is described below:

1.  Prisoner Injury Files.  A "Prisoner Injury File" is the most common report that officers use to document the use of force.  Each such file includes:
    a.  SPD-276 form;
    b.  Non-mug shot photographs of the arrestee and his injuries;
    c.  Prisoner injury report narrative(s); and
    d.  Arrest Report.

When a prisoner is booked, an officer in charge (typically the booking sergeant) must complete an SPD-276 form when he or she "finds any bruises, cuts or other injuries" on a prisoner.[7]  In the SPD-276 form, the officer documents the arresting officer's name(s), the prisoner's name, the prisoner's marks or bruises, and how the marks or bruises were caused.  The booking sergeant also takes non-mugshot photos for inclusion in the file.

Under SPD policy, the commanding officer also obtains prisoner injury report narratives from all officers involved with the arrest if a prisoner's injury is alleged or suspected to have been inflicted by an officer.[8]  In the report narratives, officers are supposed to detail any force used by the involved officers and the circumstances surrounding the use of force.  A prisoner injury file also includes the related arrest report for the encounter in which the injury was sustained.

If a prisoner's injury requires medical attention, policy requires the SPD Captain of Professional Standards to cause a preliminary investigation to be conducted to ensure that proper procedures were followed.[9]  The prisoner injury files we reviewed generally included a boilerplate memo from the commanding officer stating that the prisoner's injuries were consistent with the officers' narratives and recommending no further investigation into the incident.

2.  <u>Arrest Reports.</u>  Some references to uses of force are also captured on SPD's "Arrest Report" form.  This form is principally used to document arrests, not uses of force, but the form includes a section where officers document the circumstances and justification for an arrest, which sometimes include reports of force being used.  However, while an arrest report narrative may reference the force incidentally used to effect an arrest, it does not typically provide a detailed description of the actions justifying a use of force, and/or the precise nature of the use of force that one would expect in a use-of-force report.

3.  <u>Use-of-force Reports.</u>  SPD only requires officers to file a "Use-of-force Report" when they use a less-lethal force *tool*, such as electronic weapons (*e.g.*, Tasers), oleoresin capsicum spray (OC spray), batons, or other impact tools.  Unlike most other police departments, SPD policy does not require written reports to be completed when hands-on force alone is used, such as punching or kicking.[10]

---

[7]     *See* Massachusetts General Law (M.G.L.) ch. 276 § 33.
[8]     Revised AO 88-594 Prisoner Injury/Arrest Reports (effective date Jan. 27, 2010).
[9]     SO 10-005, Prisoner Medical Attention Injury (effective date Jan. 17, 2010).
[10]    SPD General Order 500.76, Reporting the Use of Deadly Force and Less Lethal Force Tools, p. 2 (effective date Jan. 1, 2015).  By contrast, most other police departments require officers to report any kind of force that exceeds what is necessary for compliant handcuffing.  For example, the Massachusetts Chiefs of Police Association recommends that:  "All officers shall complete a Use of Force Report if they are involved in any instance wherein physical force greater than handcuffing of a compliant detainee, 'soft hand physical compliance techniques' or 'come-alongs' are utilized…"  *See* https://www.erving-ma.gov/sites/ervingma/files/uploads/1.01_use_of_force.pdf; *see also* Baltimore Police Department Policy 725, Use of Force Reporting, Review, and Assessment, p. 2,4 (effective date Nov. 24, 2019) (requiring

While SPD policy does not preclude officers from reporting other types of force, no officer we interviewed indicated that he or she submits use-of-force reports for hands-on uses of force.  Instead, SPD officers sometimes report uses of hands-on force informally in one of the two other forms listed above:  a prisoner injury report narrative or an arrest report.

We requested and received every arrest report and use-of-force report for a five-year period spanning from 2013-2018, and every prisoner injury file created from 2013 through 2019. This set of documentation included over 1,700 prisoner injury files, approximately 26,000 arrest reports, and over 700 use-of-force reports.  In light of the fact that this investigation is focused on the Narcotics Bureau specifically, we reviewed every one of the 84 prisoner injury files involving a Narcotics Bureau officer's use of any form of force from 2013-2019, as well as many of the approximately 5,500 Narcotics Bureau arrest reports between 2013 and 2018.  We also reviewed all use-of-force reports involving Narcotics Bureau officers from 2013-2018 – a total of just 10 reports for a five-year period.  Some of the 10 use-of-force reports overlap with the uses of force reported in the prisoner injury files and document the injuries that resulted from the use of OC spray and tasers.  In addition to reviewing all Narcotics Bureau-related incident reports, we also reviewed hundreds of other use-of-force incidents, both to ensure that our investigation did not omit incidents involving Narcotics Bureau officers and to better understand the use-of-force practices of the Department as a whole.

### III.      THE NARCOTICS BUREAU'S USE-OF-FORCE PRACTICES

We have reasonable cause to believe that Narcotics Bureau officers engage in a pattern or practice of using excessive force in violation of the Fourth Amendment.[11]  We reviewed the Narcotics Bureau's force practices mindful that officers have both the right and responsibility to protect themselves and others from threats of harm, which could arise at any point in a particular situation.  Nonetheless, our investigation showed that Narcotics Bureau officers resort to force when there is no legal justification to do so, and that in situations where force is justified, Narcotics Bureau officers use force that is more severe and dangerous than is reasonable.  In particular, our investigation revealed a pattern or practice of unlawful non-lethal and less-lethal use of force within the Narcotics Bureau.

#### A.  Legal Standard

The use of excessive force by a law enforcement officer violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Excessive force claims are analyzed under the Fourth Amendment's "reasonableness" standard, and courts are to balance "the nature and

---

officers to complete use-of-force reports for hand control, escort, and pressure point compliance techniques, as well as "[f]orcible takedowns that do not result in actual injury or complaints of injury"); Portland Police Bureau, Policy 1010.00, Use of Force (effective Jan. 19, 2020) (categorizing resisted handcuffing, resisted control, and all takedowns, whether controlled or resisted, as reportable uses of force).

[11]      Throughout, we use the terms "unreasonable" and "excessive" interchangeably; both terms refer to force that exceeds constitutional limits, or in other words, is disproportional in light of the threat posed to officers or others, the level of resistance, and the severity of the crime suspected.

quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal citations omitted). Courts use a "totality of the circumstances" approach and assess the reasonableness of the force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* The reasonableness inquiry is an objective one: "whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying inquiry or motivation." *Id.* at 397. Even if uses of force do not result in serious injuries, the force can still be excessive. *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002); *Alexis v. McDonalds Rests. of Mass., Inc.*, 67 F.3d 341, 353 & n.11 (1st Cir. 1995).

While this investigation focused on whether Narcotics Bureau officers' use-of-force practices exceed constitutional limits, SPD also places limits on officers' use of force through Department policies. SPD's main general order governing the use of force provides: "It is the policy of the Springfield Police Department that an officer's force response must be objectively reasonable in consideration of the officer's perception of the risk/threat presented, and the officer's perception of the subject's actions."[12] That general order also contains a use-of-force continuum that indicates available force options in particular situations depending on the level of resistance an officer encounters.[13]

To establish a pattern or practice of violations, the United States must prove "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). It must "establish by a preponderance of the evidence that . . . [violating federal law] was . . . the regular rather than the unusual practice." *Bazemore v. Friday*, 478 U.S. 385, 398 (1986) (quoting *Teamsters*, 431 U.S. at 336); *see also EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1188 (4th Cir. 1981) (explaining that a "cumulation of evidence, including statistics, patterns, practices, general policies, or specific instances of discrimination" can be used to prove a pattern or practice). Additionally, unlike Section 1983 *Monell* claims brought by private plaintiffs, the United States does not need to show that the City had an official custom or policy that was the "moving force" behind the constitutional violations in order to establish municipal liability under Section 12601; rather, the pattern or practice of unconstitutional conduct is alone sufficient to establish liability. *See United States v. Town of Colo. City*, 934 F.3d 804, 811 (9th Cir. 2019) (holding that Section 12601 establishes liability for municipalities based on general agency principles).

## B. SPD's Narcotics Bureau Engages in a Pattern or Practice of Unreasonable Force in Violation of the Fourth Amendment

Our investigation determined that Narcotics Bureau officers use non-lethal and less-lethal force unreasonably with high frequency. Our review of 2013-2019 prisoner injury files involving Narcotics Bureau officers, for example, showed that a substantial portion of reported uses of force were unreasonable, based on an application of the standards articulated in *Graham v. Connor*, 490 U.S. 386 (1989), and an examination of whether the officers' level of force was proportional in light of whether the subject demonstrated compliance, passive resistance, active

---

[12]     SPD General Order 100.20 (Effective Date: Jan. 1, 2015) at 1.

[13]     *Id.* at 2-5.

resistance, or assaultive behavior.[14]  Within this pattern or practice of excessive force, our investigation identified a specific trend of Narcotics Bureau officers striking suspects in the head, or otherwise using force that results in blows to the head, in situations where such force is not justified.  Our investigation was narrowly focused on the use of force by the Narcotics Bureau; however, our conclusion is supported by evidence of other SPD officers escalating encounters and employing head strikes without justification.

Narcotics Bureau officers regularly punch subjects in the head and neck area without legal justification.  The routine reliance on punches during arrests and other encounters that we discovered during our investigation indicates a propensity to use force impulsively rather than tactically, and as part of a command-and-control approach to force rather than an approach that employs force only as needed to respond to a concrete threat.  This reliance on punches to the head also indicates a failure of officers to appropriately comprehend the seriousness of head strikes and the resistance that must be encountered to justify their use.  Punches and other blows to the head are dangerous, and can create a substantial likelihood of causing death or serious bodily injury.  *See Conlogue v. Hamilton*, 906 F.3d 150, 156 (1st Cir. 2018); *Wade v. Fresno Police Dep't.*, No. 1:09-CV-0599 AWI-BAM, 2012 WL 253252 (E.D. Cal. Jan. 25, 2012), *aff'd*, 529 Fed. Appx. 840 (9th Cir. 2013) (unpublished) ("Choking and punching are broadly characterized as non-lethal levels of force, though both may be employed in a manner that creates a substantial risk of death or serious bodily injury.").

To its credit, SPD has adopted general orders that recognize the seriousness of head strikes.  A policy on impact tactics provides that "officer[s] should avoid strikes to the subject's head, neck, spine, kidney and solar plexus area(s).  Targeting of more vulnerable areas of a subject's body should be undertaken only under the proper circumstances."[15]  And SPD's main use-of-force policy designates head strikes as a "level four" use of force on a five-level continuum, with only deadly force requiring greater justification.  The policy establishes that punches to the head are not permissible unless a subject is actually "assaultive," defined as engaged in a perceived or actual attack on the officer or another person.  If a subject is instead exhibiting only "active resistance," an SPD officer must use compliance techniques other than punches to the head.[16]

Similarly, according to nationally accepted standards, punching a subject in the face should not be the first method of trying to gain compliance of a subject.  Indeed, some states'

---

[14]      As discussed in detail in Section III.C, our analysis likely undercounts the frequency of unreasonable force.  First, of the Narcotics Bureau prisoner injury files from the period that we reviewed, in 46% of cases, officers failed to provide sufficient detail to make a determination one way or another as to the legality of the force used.  These incidents did not factor into our investigative conclusions about excessive force even though the records of these incidents do not contain adequate information to determine the force used was justified.  Moreover, while we reviewed all reported Narcotics Bureau uses of force, our investigation identified evidence that force used by Narcotics Bureau officers commonly goes unreported.  For example, in reviewing all of the Narcotics Bureau's 2017 arrest reports where the narrative indicates that the prisoner was likely to have been injured at the hands of an officer, booking sergeants only completed SPD-276 forms 11% of the time, indicating a large number of force incidents that were not reported by officers, reviewed by supervisors, or available to us during this investigation.

[15]      SPD General Order No. 500.50, Impact Tactics.

[16]      SPD General Order 100.20, at pp. 3-4 (effective date Jan. 1, 2015).

training standards expressly note the dangers of this form of force, including that "a blow of sufficient force with any personal body weapon [such as hands and feet] to a vulnerable part of body during an attack could result in injury or fatality," including face, throat, head, and neck.[17] Scientific and professional literature confirms that punching someone in the head, face or neck area has the potential to cause disfigurement, damage major blood vessels, can lead to traumatic brain injury, and can possibly even sever the spinal cord.[18]  Punches to the head also often result in additional head injuries if and when a subject falls to the hard ground.  In addition, fist strikes are not only dangerous for subjects, but also create a real risk of injury to officers.  If an officer injures his or her dominant hand while executing a fist strike, the officer is made vulnerable by being unable to access other force tools to protect himself.[19]  Even in situations where strikes to a subject's head are warranted, palm strikes or hammer punches are safer for both the officer and subject than knuckle punches.

Contrary to law, SPD policy, and national standards, Narcotics Bureau officers routinely resort to punching subjects' head areas with closed fists as an immediate response to resistance without attempting to obtain compliance through other less serious uses of force.  Out of all 84 Narcotics Bureau Prisoner Injury Files from 2013 through 2019, roughly 19% of the uses of force reviewed included punches to subjects' heads, and approximately an additional 8% involved injuries to subjects' heads from another form of a head strike.  In a significant number of these cases, such force was unreasonable.

For example, in one incident, Narcotics Bureau officers punched V.A., a 25-year-old man, following a foot pursuit.[20]  When the four Narcotics Bureau officers approached V.A. and motioned to him to remove his earphones, officer reports state that V.A. pushed one of the officers and began running away.  After they caught up to V.A., a Narcotics Bureau supervisor delivered multiple punches to V.A.'s face, allegedly because V.A. looked prepared to fight by holding his closed fist in a "punching position."  V.A. sustained a broken nose and lip laceration requiring three stitches.  The incident then allegedly continued on the ground with an officer and V.A. exchanging blows, though there is no evidence indicating that the officer sustained any injuries.  Instead, it appears that officers chased V.A. and initiated the use of force by striking V.A., a non-assaultive subject, with multiple punches, immediately using a means of force that was disproportionate to the subject's resistance without attempting other less dangerous uses of force.  Given that four officers were present, other methods of control could have been used instead of immediately punching him in the head.

In another incident, a Narcotics Bureau officer punched T.S., a 17-year-old youth, as he rode a motorbike past a group of Narcotics Bureau officers.  At the time of the punch, the officers were making unrelated arrests; when the youth rode his motorbike past the officers,

---

[17]     California Peace Officers and Standards Training LD 33.01.E04.
[18]     Ed Flosi, *When a Cop Throws a Punch to the Face*, policeone.com, Nov. 11, 2010, available at https://www.policeone.com/legal/articles/2866927-When-a-cop-throws-a-punch-to-the-face/; *Traumatic Brain Injury*, American Association of Neurological Surgeons, available at https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Traumatic-Brain-Injury.
[19]     *See* Mike Siegfried, *Safer Strikes*, policemag.com, Aug. 5, 2010, available at https://www.policemag.com/340364/safer-strikes.
[20]     Name abbreviations used in this letter are pseudonyms.

reportedly at a high rate of speed, an officer struck the youth.  In the involved officer's arrest report, he does not characterize the strike as a punch, but rather states that he "extended his left arm" to prevent the youth from colliding with him on the motorbike.  The 17-year-old then "swerved" his motorbike and the officer ended up "mak[ing] contact" with the youth's head and shoulder area.  Administering a fist strike in this circumstance was particularly dangerous as the youth could have easily lost control of the motorbike, severely injuring himself, the officer, or others.  The subject's brother, L.S., was also punched in the face, but by a different Narcotics Bureau officer.  The officer who punched L.S. reported that he did so because L.S. ran towards the officer "with his fist clenched and arm cocked back."  None of the other officers at the scene corroborated the punching officer's account.

In a third incident, a Narcotics Bureau officer pushed J.B., a 22-year-old man, in the face following a foot pursuit where J.B. exhibited no assaultive behavior.  After four Narcotics Bureau officers observed J.B. to be engaged in a narcotics transaction, an officer engaged in a foot pursuit and shoved J.B. from behind so that he fell to the ground.  As reported by the officer in the prisoner injury report narrative, J.B. rolled over and began to push at the officer in an attempt to escape, as opposed to in an assaultive manner.  The Narcotics Bureau officer then struck J.B. in the face with a closed fist, resulting in a laceration to his lower lip.  Nothing in the officer's narrative indicated that J.B. was engaging in the kind of active physical threat that would condone the use of a knuckle punch to the face.  The fact that four Narcotics Bureau officers were involved in this arrest made it even less necessary to strike the subject in the head to gain compliance.

These incidents are merely examples and are not atypical within the Narcotics Bureau. We found multiple incidents in which officers used head strikes following a pursuit, even when officer reports suggest the subject was already subdued, including an incident where the Department of Justice has charged the officer with criminal color of law violations.  Tellingly, a former Narcotics Bureau officer reported that people know that if you mess with the SPD or try to run, you "get a beat down."  Incident reports we reviewed support this officer's observation.

In many incidents involving head strikes, Narcotics Bureau officers unnecessarily escalate encounters and immediately punch subjects without employing other control tactics that are lower on the use-of-force continuum.  While law enforcement officers may inevitably need to use force to carry out their job, the law prohibits officers from using force that is disproportionate to the threat at hand.  *See Graham*, 490 U.S. at 396; *Jennings v. Jones*, 499 F.3d 2, 11 (1st Cir. 2007).  Generally, using a greater level of force is not reasonable when the officer did not encounter "any danger or physical resistance that required him to escalate his use of force" to effectuate arrest.  *See Jennings*, 499 F.3d at 20-21 (use of increased force after a subject stops resisting violates the Fourth Amendment).  Nonetheless, we reviewed multiple incidents in which officers used more severe force than the situation warranted.

In the course of one drug arrest, for example, a Narcotics Bureau officer punched R.F., a slight, middle-aged man, while attempting to retrieve contraband.  Officer reports state that R.F. resisted opening his fist and instead attempted to free his wrist from the Narcotics Bureau officer's grasp; officers then immediately punched him in the face.  The Narcotics Bureau officer who punched R.F. escalated the situation without attempting other means of gaining compliance,

unnecessarily resulting in a serious use of force.  R.F. is not a large individual – 5'9" and 140 pounds – and there was no evidence that he had access to a weapon or otherwise posed a threat. The arrest report also shows that at least four Narcotics Bureau officers were on the scene. These circumstances do not justify escalating the encounter to include use of a head strike.

In many situations, Narcotics Bureau officers quickly escalate their situational responses to involve force without first identifying themselves as officers or issuing verbal commands. Given that Narcotics Bureau officers often operate as plainclothes officers, they often do not have uniforms or other indicators that would help distinguish them as law enforcement officers. Nonetheless, we found that officers fail to take basic steps to identify themselves before resorting to force.  *See Shea v. Porter*, 56 F. Supp. 3d 65, 88 (D. Mass. 2014) (considering the fact that the subject did not believe or know that the person in plain clothes was indeed a police officer as an additional factor weighing in favor of a finding of excessive force).  In one incident, *see infra* Section III.C.3., video footage shows that officers rushed into a store and immediately hit S.L. in the face.  The encounter happened so quickly that it appears the plainclothes officers failed to identify themselves.  The video lacks audio, but at a minimum, the video makes clear that if officers did announce themselves or issue a command, they failed to provide S.L. with any time to react to the officers and surrender before he was hit.

Relatedly, we reviewed incidents in which officers' failure to identify themselves resulted in pursuits that ultimately escalated into unreasonable uses of force.  In two nearly identical situations we reviewed involving vehicle pursuits, the drivers stated that they did not immediately stop their vehicles because they did not know that the plainclothes Narcotics Bureau officers in pursuit were in fact officers and instead feared they were being chased by criminals. The narcotics officers were in unmarked cars, and did not activate their lights.  Once the drivers did eventually stop their cars—in one case because an officer in a marked cruiser came on scene and activated his blue lights, and in the other case because the individual collided with another car—the police then used unreasonable force to effect the arrests.

In the case of P.J., he claimed that he fled in his vehicle because he was being chased by an unmarked vehicle and did not know law enforcement officers were in that vehicle.  In one report, an officer describes "extracting [P.J.] through the passenger side door and proned [him] face down onto the pavement."  Photos show he sustained significant injuries—severe contusions and dark bruising on the right side of his face, a large black eye, a gash on the bridge of his nose, and additional abrasions on the left side of his face and the left side of his nose. These injuries are inconsistent with the officers' reports that P.J. had "small cuts to the face," and are instead consistent with repeated strikes of his head.

In the case of F.D., two Narcotics Bureau officers, including one supervisor, stated that after a brief pursuit of F.D.'s vehicle, they pulled F.D. from the car onto the ground.  One officer's report says F.D. was "placed" on the ground and another officer's report states that F.D. was "escorted" to the ground.  But photos of the abrasions to F.D.'s face demonstrate the use of serious force and multiple points of impact including:  the left side of his forehead, the right side of his forehead, and his cheek.  F.D. reported in an interview that he was kicked in the face and upper body area 10-12 times, with multiple officers taking turns kicking him.  Regardless of whether these injuries were caused by an aggressive takedown or direct kicks to the head, the

14

prisoner injury report narratives do not indicate that any such force was necessary. None of the officer reports state that F.D. resisted arrest or was combative, and this is further supported by the fact that he was not arrested for resisting arrest or assault and battery of a police officer. According to documents, 12 officers were listed as involved with the arrest and four officers completed prisoner injury report narratives, all arising from an incident that began when F.D. failed to stop because he did not know he was being chased by officers.

Had Narcotics Bureau officers properly announced themselves and given P.J. and F.D. an opportunity to surrender peacefully, which both reportedly did once they finally realized the plainclothes officers were law enforcement officers, the Narcotics Bureau officers could have likely engaged in a straightforward arrest without the use of unreasonable force.

In addition to directly striking subjects' heads, Narcotics Bureau officers also engage in similar conduct that, like head strikes, could reasonably be expected to cause head injuries without legal justification, including conducting unnecessarily forceful takedowns. This type of force is particularly troublesome because the resulting crash to the pavement can cause serious injuries such as bone fractures and head trauma. *See Raiche v. Pietroski*, 623 F.3d 30 (1st Cir. 2010) (tackling plaintiff from his motorcycle and slamming him into the pavement constituted excessive force).

For example, in the course of a recent arrest, roughly a dozen officers, most of them Narcotics Bureau officers, executed a narcotics warrant for A.E. After a vehicle pursuit, A.E. eventually stopped but refused to get out of the car, and officers physically pulled him out. At some point during his extraction from the car, A.E.'s head struck the pavement directly, and the booking photos show significant swelling in his right forehead area in two points of impact, indicating that officers likely used additional force once A.E. was on the ground. The officers' own reports indicate that Narcotics Bureau officers had A.E. under control at all times, and nothing indicates that his head needed to be slammed to the pavement. Despite the serious head injuries depicted in the booking photos, one officer's report described A.E. as having only a "minor injury" above his eye. Notably, the Narcotics Bureau officers' accounts of what happened in the course of the arrest are also inconsistent with each other. One Narcotics Bureau officer reported that A.E. and other officers fell to the ground together, and that A.E. then continued to struggle and resist handcuffing. Another officer did not mention that any officers fell to the ground, and instead reported that A.E. tried to pull away when officers handcuffed him and "stumbled falling to the ground." Viewed in isolation, each officer's report fails to describe circumstances that would justify the level of force used in this encounter. Viewed together, the inconsistencies between these reports demonstrate that the officers did not accurately report how A.E. sustained the significant and multiple injuries to his head.

Across these and other incidents, we identified trends and practices that are unique to the specialized work of the Narcotics Bureau. First, as discussed above, the fact that Narcotics Bureau officers often fail to identify themselves when they are in plainclothes and attempting to stop or arrest a suspect has resulted in unreasonable—and avoidable—uses of force. Second, Narcotics Bureau officers often execute search warrants or planned seizures, operations that often involve many officers. The tactical benefit of having multiple officers on scene should be that officers have the opportunity to engage in more strategic planning of the arrest or raid. In

practice, however, the presence of multiple narcotics officers appears to lead to less thoughtful decision-making and increased uses of force.  Further, in some of the incidents summarized above, one of the many officers on scene included a supervisor, which means that supervisors are not only involved in the use of force, but implicitly approving the uses of force.

### C.  Narcotics Bureau Force Violations Are Likely More Widespread Than Indicated in SPD Documents

Our investigation shows that the pattern or practice is likely more widespread than is captured by SPD documents.  We identified substantial evidence that, over the last six years:  (1) Narcotics Bureau officers failed to report use-of-force incidents that should have been reported even under SPD's lax policies; (2) where force did get reported, officers often used vague language, which prevented us from identifying a particular use of force as unlawful in a significant number of cases; and (3) officers made false reports that were inconsistent with other available evidence, including video and photographs, suggesting that there are additional instances of unreasonable force that we were not able accurately to assess in cases where no photographic or video evidence exists.

### 1.    Narcotics Bureau officers underreport uses of force

Narcotics Bureau officers regularly underreport uses of force and the injuries that result. As discussed above in Section II, SPD policy requires all uses of force that cause an injury to a subject to be documented in a prisoner injury file; only then is a particular use of force reviewed by a supervisor.  During our review of arrest reports, however, we identified a large number of incidents in which officers reported using force to apprehend a suspect on the arrest report but failed to complete an accompanying prisoner injury file to specifically document the force used. These references to force in arrest reports included uses of force like takedowns or forcibly removing a suspect from a vehicle while he or she was resisting.  While the officers' descriptions of force in these arrests reports is typically vague, in many cases, the force was likely to have caused some injury.  In 2018, there were 32 Narcotics Bureau arrest reports that referred to a use of force where an injury may have likely occurred.  Yet, Narcotics Bureau officers failed to complete a prisoner injury file in  21 (66%) of those incidents.  Similarly, for 2017, 81 Narcotics Bureau arrest reports referred to a use of force where an injury to a prisoner likely occurred. Narcotics Bureau officers failed to complete a prisoner injury file in 72 (89%) of those cases.

For example, during the execution of an arrest warrant in 2017, a Narcotics Bureau officer used force against a subject who refused to exit his home, but the officer did not report the use of force in a prisoner injury file.  Citing an "aggressive barking dog," the officer executing the warrant deployed one burst of oleoresin capsicum (OC) spray to the subject's face through a window, and then pulled the subject through the door.  Once the subject was out of the house, the officer used a leg sweep, causing the subject to land on the floor of the porch.  The officer then struck the subject with his fist in the upper arm/shoulder area.  The force employed during this incident was not reported in a prisoner injury file.

According to another Narcotics Bureau arrest report from 2018, while executing an arrest warrant related to the sale of narcotics, officers took a subject from the front seat of a car and

placed him face down on the street in order to be handcuffed.  The arrest report notes that he "sustained minor abrasions to his forehead."  There is no accompanying prisoner injury file for this incident.

Among the over 5,000 Narcotics Bureau arrest reports we received during our investigation, many refer to a use of force that is not documented anywhere else.  Given that arrest reports only contain cursory references to force used during the arrest, the failure to properly complete a prisoner injury file in cases where force resulted in injury likely shielded many additional uses of force from our review.  This also underscores the failures in supervisory oversight within the Department, as supervisors reviewing these arrest reports should have filled out SPD-276 forms at the time of booking, and additionally directed the involved officers to fill out prisoner injury report narratives.

2.    Prisoner injury report narratives are often vague and fail to detail officer actions

Narcotics Bureau officers' narratives in the prisoner injury reports they do file are consistently vague and use generic, patterned language.  In many cases, this makes it impossible to identify the circumstances surrounding a particular use of force or whether the reported force was unreasonable.  Indeed, we were unable to make a determination about the reasonableness of force in 43% of the Narcotics Bureau prisoner injury files reviewed during this investigation, and accordingly, supervisors too lacked the information they needed to determine whether their officers were using force appropriately.

Officers regularly use rote and pat language to justify their uses of force without providing individualized descriptions.  Reports often contain conclusory language calling a particular use of force reasonable without describing in detail the circumstances surrounding the use of force.  One report, for example, said that as the officer attempted to stop the subject from fleeing, they "both violently fell to the ground.  Once on the ground [the subject] continued to struggle[,] at which point [another officer] arrived and began assisting and controlling and placing [the subject] under arrest."  The report concludes by stating, "[o]nly reasonable and necessary force was used to apprehend the subject."  Other reports acknowledge some sort of a struggle, but fail to document the specific resistance encountered or the specific type of force used by the officers involved.  One such prisoner injury narrative simply stated about a female subject that, "[d]ue to her resisting [arrest] and in order for us to safely handcuff her, we had to bring her down, in a prone position, face first, onto the sidewalk.  During this struggle she sustained scrapes to her face area."

The use of vague and rote language obscures the details of many incidents, and precludes meaningful supervision and oversight within the Department.

3.    Narcotics Bureau officers submit reports with inaccurate or falsified information

During our investigation, we sought to compare the narratives Narcotics Bureau officers reported in prisoner injury files with other available evidence regarding the same incident, such

17

as photographs and/or videos.  We found multiple incidents in which available evidence discredited the Narcotics Bureau officers' account of what occurred.  This is consistent with a former SPD officer's characterization of the Narcotics Bureau as a "rogue unit," whose officers were known for routinely cutting corners.

In the case of P.J., described above, a Narcotics Bureau officer stated that he made an effort "to extract[ ] [P.J.] through the passenger side door and prone[] [him] face down onto the pavement."  According to another officer's narrative, this resulted in "minor abrasions to the right side of his face," and according to the booking sergeant in charge of filling out the SPD-276 form, P.J. had "small cuts to the face."  These descriptions of P.J.'s injuries are plainly contradicted by the photographs in his prisoner injury file.  These photographs clearly show severe contusions and dark bruising on the right side of his face, a large black eye, a gash on the bridge of his nose, and additional abrasions on the left side of his face and the left side of his nose.  The injuries present in the photographs are inconsistent with the officers' reports, and are instead consistent with repeated strikes to P.J.'s head.  Further, when interviewed by IIU after P.J. filed a complaint, a civilian witness stated that she saw officers kick P.J. in the head and body.  During his IIU interview, P.J. stated that one officer struck him in the head with the butt of a handgun, and that once on the ground, several officers began kicking and punching him in the head and the body.  P.J. further alleged that, once back at the station and in a holding room, a Narcotics Bureau officer walked in and beat him severely in the face with a book, causing him to bleed profusely.  To be clear, there is no other corroboration of P.J.'s version of events besides the photographs we reviewed and the statement of the civilian witness.  But these pieces of evidence are more consistent with some of P.J.'s reporting of the takedown than the officers' reports.  Although IIU investigated P.J.'s complaint, IIU failed to sustain P.J's allegations and the officers received no discipline.

Instances of officers downplaying the extent of a prisoner's injuries in their official reports were commonplace in the files we reviewed.  In another prisoner injury file, Narcotics Bureau officers report that M.K., a 5'3" man, had a "small cut over and under his left eye," whereas the photographs show not only the small cuts but that his eye was almost swollen shut.

In a 2016 incident, security camera footage directly contradicted aspects of the reports of Narcotics Bureau officers.  In reports documenting a Narcotics Bureau arrest of S.L., a Narcotics Bureau officer stated that as he reached out to secure S.L., S.L. "backed away and struck [him] in the face with a closed fist."  The officer reported that he then struck S.L. in the face and upper body in an attempt to stop S.L. from striking him again.  As reported by the officer, the circumstances of this interaction would justify the force used.  But the officer's account is belied by video evidence, which shows S.L. standing, looking down at a piece of paper in his hand, when two plainclothes officers rush towards S.L., grab his wrist and tackle him to the ground. But for the video evidence of what happened in this use of force, the use of force described in the misleading reports provided by the officers would have appeared reasonable.

In many cases, we were only able to identify untruthful reporting—and deficiencies in the way force was actually used—because photographic and/or video evidence happened to be available.  However, these inaccurate reports indicate that it is not uncommon for Narcotics Bureau officers to write false or incomplete narratives that justify their uses of force.  Because

many prisoner injury files lack photographs of subjects' injuries (in contravention of SPD policy) or video evidence of the arrest, the inaccurate narratives raise substantial concern that there are other uses of unreasonable force that are falsely reported.

### D. Deficiencies in Basic Department Operations Contribute to the Narcotics Bureau's Pattern or Practice of Excessive Force

SPD's deficient use-of-force and accountability policies—failure to require detailed and consistent use-of-force reporting, and failure to meaningfully review use-of-force reporting—directly contributes to the Narcotics Bureau's pattern or practice of unreasonable force. Conversely, reform in this area would go a long way to mitigating the problem.

#### 1. SPD policy does not require appropriate use-of-force reporting

SPD's use-of-force policies establish a use-of-force continuum showing different levels of resistance and the severity of force justified by each. However, the Department's use-of-force policies lack certain common provisions that, if adopted, could have the capacity to reduce the incidence of unreasonable force. Most significantly, while we identified many instances in which Narcotics Bureau officers unnecessarily escalated encounters, SPD policy does not require officers to attempt to de-escalate encounters before resorting to force. The relevant policy states only that officers "may de-escalate, stabilize or escalate his/her response based upon his/her risk assessment and the perceptions of the subject's degree of compliance or non-compliance." The policy does not provide guidance regarding potential de-escalation techniques available to officers. Further, while we identified several uses of unreasonable force where multiple officers were on the scene, SPD policy does not require officers to intervene if they observe an unlawful use of force occurring.[21]

Moreover, the use-of-force reporting policy does not require the reporting of certain significant uses of force, such as takedowns, punches, or other "hands on" uses of force. Further, even where policy requires reporting of particular types of force, policy does not specify the level of detail to be reported or supervisor responsibilities in reviewing the reports. Thus, current policy allows the vague reporting we saw in prisoner injury report narratives and arrest reports. Without a reporting mechanism that documents force and is reviewable by supervisors, Narcotics Bureau officers are able to engage in force without appropriate oversight.

As discussed in Section II, three types of reports can contain information regarding a use of force: (1) Prisoner Injury Files; (2) Arrest Reports; and (3) Use of Force Reports, which must be completed following the deployment of specific weapons, including OC spray and electronic control weapons. Even in combination, however, these forms do not capture – and SPD policy does not require the reporting of – uses of force that do not involve specific weapons or injuries to jailed suspects. This massive gap in policy means that officers do not report many uses of force.

---

[21]       While we did not review any incidents involving lethal encounters, SPD policy also does not include any requirement that officers attempt to warn individuals before firing their service weapons if it is reasonable to do so, does not prohibit or otherwise directly limit the use of neck restraints, and does not explicitly require that medical care be provided following a use of force once it is safe to do so.

First, prisoner injury files are ineffective as a general force report as they are not used to capture force unless it caused an observable injury.  This provides too much discretion as to whether force should be reported, and risks officers being able to avoid reporting uses of force that *do* result in injuries by claiming they did not see one.  Nor does SPD policy provide any guidance regarding what constitutes an "injury" and thus triggers the required creation of a prisoner injury file, which exacerbates the inconsistency of reporting.  Under SPD policy, Narcotics Bureau officers need not report uses of force involving strong hands, punches and other hand strikes, feet, or elbow strikes unless they result in an injury.  In interviews with Narcotics Bureau officers and other SPD officers, they confirmed that it is not Department practice to record these types of uses of force, and that any use of arrest reports or prisoner injury files that happen to document such encounters is aberrational.  This practice is especially problematic given that Narcotics Bureau officers primarily use hands-on force.

Second, current force reporting practices do not capture any uses of force against a non-prisoner or a non-arrestee.  Because prisoner injury files and arrest reports are the primary documents used to capture uses of force, no mechanism exists to monitor uses of force against individuals who are stopped by the police but not ultimately arrested.  Indeed, we reviewed multiple IIU complaints against Narcotics Bureau officers for using excessive force against individuals who were not arrested.  In one of them, the complainant alleged that a Narcotics Bureau officer reached in the car while she was driving, pushed her against the seat, and grabbed her hand and slammed it into the dashboard so hard that she was bruised.  In her IIU complaint, she submitted photos showing bruises.  Because she was not arrested, no arrest report or Prisoner Injury file exists for this incident.  In another incident, the complainant alleged that a Narcotics Bureau officer pulled him out of a car and handcuffed him roughly, only to release him because they had attempted to arrest the wrong person.  Following IIU investigations, neither of these complaints were sustained.  The importance of access to IIU and strong complaint investigation procedures is particularly salient in situations where SPD officers do not have to draft arrest reports or other documentation concerning an encounter with an individual.  Under SPD's current system, an IIU complaint is the only way these allegations of officer force will come to light.

Third, though many officers essentially treat the prisoner injury report narrative as a general use-of-force report, prisoner injury files serve a very different function: namely, to comprehensively document and review prisoner injuries alleged or suspected to have been inflicted by an officer.  Because of this principal function, officers tend to use the report narratives only to document injuries.  In many cases, officers simply report injuries that prisoners had before officers arrived, likely for liability purposes.  For example, of all prisoner injury files from 2013 through 2018, the content of about one-third was limited to documenting that a prisoner had an injury before officers arrived to the scene.

   2.   Narcotics Bureau supervisors do not meaningfully review uses of force

The fact that Narcotics Bureau officers can routinely submit use-of-force reports and prisoner injury report narratives that lack meaningful detail about a use of force is especially concerning in light of the fact that Narcotics Bureau supervisors reviewed and approved all of

the uses of force, including those highlighted in this report. Despite the many instances of unreasonable force identified by our team, SPD Captains signed off on every single prisoner injury file without once referring an incident of force to the Commissioner for IIU investigation. This occurred despite the fact that, on multiple occasions, outside evidence, including video footage, demonstrated that Narcotics Bureau officers' descriptions of events involving use-of-force situations was not credible.

SPD does not have a policy addressing supervisory responsibilities in reviewing prisoner injury files, arrest reports, or use-of-force reports, and the dearth of detail contained in the prisoner injury files supports a conclusion that supervisors do not ask questions, require more information to be submitted, or critically review the reports to ensure that uses of force are appropriate. This results in failures in supervisory oversight at every stage of review. We understand that, in theory, prisoner injury files are reviewed by a sergeant, a watch commander, the SPD Quality Assurance Captain, and ultimately the Commissioner. In practice, however, it appears that the prisoner injury files are rubber stamped without any meaningful review.

As discussed above in Section II, booking sergeants fill out the SPD-276 form. Booking sergeants are not assigned specifically to the Narcotics Bureau, but are supervisors who are stationed at the booking desk and help process arrestees – regardless of the specific unit that arrested the person. Almost universally, these entries on the SPD-276 form are brief and lack detail. Nor does it appear that supervisors require officers to provide more information when additional detail is needed to describe an encounter. For example, it is not uncommon for booking sergeants to document that a prisoner "states undercover officers beat him," or that a prisoner states that "officers punched and used knees to hit him." These statements should lead to further inquiry by the reviewing supervisor to identify the nature of the force to determine whether it was reasonable. Nothing in policy requires supervisors to do so, nor do they do so in practice.

The SPD Quality Assurance Captain reviews prisoner injury files to flag any instances where a prisoner's documented injuries are inconsistent with the prisoner injury report narratives. This review occurs after the chain of command of the officer using force reviews the file. While this role is important, it does not appear that the review is meaningful. Of all 1,700 prisoner injury files produced, we saw only 179 SPD Quality Assurance Captain memos analyzing whether a prisoner's injury was consistent with the officer's account. The Quality Assurance Captain signed off on <u>every single</u> prisoner injury file, without once referring an incident of force to the Commissioner for IIU investigation. Indeed, during our review of every prisoner injury file between 2013 and 2018, we only saw a single instance in which the Quality Assurance Captain requested that the arresting officers submit report narratives to explain how the prisoner received his injury when the officer narratives were absent; once submitted, the file was approved without referral to IIU. We heard in interviews that the Quality Assurance Captain refers prisoner injury files to IIU regularly, but we saw no evidence or documentation of this in our review of the prisoner injury files, and our reviews of IIU investigations similarly did not reveal any use-of-force investigations based on prisoner injury files that had been administratively referred by the Commissioner.

The lack of rigorous supervisory review of uses of force enables deficient force reporting by involved officers. More significantly, it leads to officers using force, particularly hands-on force, without fear of oversight or consequence.

3.   SPD does not have adequate systems in place to detect, address, and prevent officer misconduct

Police departments have the responsibility to detect misconduct and take steps to prevent their officers from engaging in it. The components of an effective accountability system are well-established and include procedures to ensure that misconduct is fully reported by fellow officers and supervisors; that complaints from members of the public are accepted and not discouraged, and that all allegations of misconduct are investigated thoroughly and fairly, without regard to improper external factors or biases. Developed and implemented properly, these systems will fairly and objectively determine whether officers acted both lawfully and consistently with departmental policy or should instead face discipline, as well as determine whether the incident raises policy, training, tactical, or equipment concerns that need to be addressed for officer and civilian safety. These basic measures are essential for ensuring that misconduct occurs rarely and that, when it does occur, officers are held accountable.[22]

SPD does not have an adequate accountability system in place. As a result, Narcotics Bureau officers who use excessive force or engage in other violations of law or policy typically face no internal consequences. SPD fails to hold its IIU to even basic standards, creating and perpetuating an environment that permits constitutional violations by officers.

*a.   SPD's complaint intake processes are flawed*

SPD's actions have discouraged citizens from filing complaints against officers. While SPD purports to accept citizen complaints at any location, to any officer, and in any form, we learned during our investigation that, in practice, this is not the case. SPD commanders we interviewed said that they do not accept citizen complaints and instead tell complainants that they must go to IIU. Some officers also reported that, if complainants appear at SPD headquarters on Pearl Street, officers there have similarly rejected their complaint and instead instructed them to go to the IIU office on Maple Street.

---

[22]      Courts considering police misconduct cases—including courts considering cases involving SPD, and Narcotics Bureau officers in particular—have long acknowledged that deficiencies in systems and operations can unequivocally lead or contribute to constitutional violations. *See, e.g.*, *Douglas v. Bigda*, No. 14-30210-MAP, Report and Recommendation Regarding Defendant's Motion for Summary Judgment (D. Mass. Oct. 14, 2016) (adopted in full by the District Court judge in *Douglas v. City of Springfield*, No. CV 14-30210-MAP, 2017 WL 123422, at *1 (D. Mass. Jan. 12, 2017) (denying the City's motion for summary judgment in a case against seven Narcotics Bureau officers for excessive force explicitly finding that, "[i]f a jury concluded that Springfield's IIU process was ineffective or weak, it could further conclude that a resulting failure to take appropriate action in response to complaints of excessive force might lead Springfield's officers to believe such conduct would be tolerated."); *Comfort v. Town of Pittsfield*, 924 F. Supp. 1219, 1233 (D. Me. 1996) (denying the Town's motion for summary judgment on claims related to police officers' use of excessive force and finding sufficient evidence to establish the possibility that a police chief's "management style created atmosphere in which officers in his command believed that he would not punish their use of excessive force.")

Community members echoed the challenges involved in filing complaints against SPD officers.  We heard members of the public complain that the Department fails to provide residents with clear guidance on how and where they can obtain a complaint form.  When community members are able to navigate the intake process, they assert that they are faced with lengthy delays when trying to acquire complaint forms.  One community member said that when she told an officer in person at SPD headquarters that she wanted to file a complaint, the officer treated her poorly and made her wait 30 minutes before giving her the form.  Another community member stated that he had to wait five hours to file a complaint at a precinct.  In a case involving Narcotics Bureau officers, the federal court denied summary judgment to the defendants and concluded that SPD's "IIU documents submitted as evidence by Plaintiff show what appears to be a consistent pattern of rejecting civilian complaints against police officers." *Douglas v. Bigda*, No. 14-30210-MAP, Report and Recommendation Regarding Defendant's Motion for Summary Judgment (D. Mass. Oct. 14, 2016), adopted in full by the District Court judge in *Douglas v. City of Springfield*, No. CV 14-30210-MAP, 2017 WL 123422, at *1 (D. Mass. Jan. 12, 2017).

### b.  *Investigations of misconduct allegations are inadequate*

Even when complaints do come to SPD, there are deficiencies apparent in the quality of the investigations of those complaints, which has directly undermined SPD's ability to hold officers accountable where appropriate.  These deficiencies also apply to internal referrals of misconduct.

Problems in SPD's misconduct investigations arise from the outset of the process, as there is a lack of consistency in how SPD classifies complaints.  Like many departments, SPD assigns some minor categories of complaints and allegations of misconduct to the chain of command for investigation, while more serious allegations are assigned to IIU given its specialized focus on conducting such investigations.  In interviews, officers asserted that all allegations of excessive force are handled by IIU, rather than by supervisors in the chain of command; but documents show this is not the case.  We found multiple chain of command investigations between 2013 and 2018 that involved allegations of excessive force and thus should have been handled by IIU, but were not.

Our review of chain of command investigations of allegations of excessive force showed significant shortcomings in investigative techniques.  For example, a prisoner complained that the "police beat me up," sprayed OC, and struck him three times on the back of the head with a flashlight.  The prisoner injury report narrative states that the prisoner had a laceration on the left side of his head and was transported to the emergency room of a local hospital for treatment.  SPD's Commissioner classified this excessive force complaint as a complaint that needed to be reviewed only by the officer's chain of command.  The investigative file consisted of the officers' statements and the arrest report; there was no statement from the complainant or witnesses.  The supervisor's discipline was to recommend retraining to "clearly articulat[e] use of force in reporting to accurately depict necessity."  The *prima facie* evidence in the reports indicated that that the officer's force was potentially excessive; in response to the subject's resisting arrest, the office struck the subject with a flashlight three times in the head–force that

could potentially cause death or serious bodily injury. Had SPD referred this case to IIU for a full investigation, the Department could have reasonably sustained an excessive force complaint, rather than finding only that the officer erred by improperly failing to justify his use of force.

When complaints of excessive force are referred to IIU for investigation, those investigations also have significant deficiencies. We reviewed five years of IIU reports on investigations of excessive force and a number of other types of investigations of Narcotics Unit officers. That review showed that IIU investigators are not using basic investigative techniques needed to accurately determine if an allegation of excessive force should be sustained. IIU interviews often lack detail and important content. For example, in many instances, the interviewer does not ask for any information from the officer beyond what is included in the officer's arrest report. Instead, IIU investigators copy and paste officers' reports into the investigation report narrative. Interviews are not memorialized by IIU investigators, and instead the IIU investigator asks the officers interviewed to write their own report on what was said. The reports that result from these interviews are of poor quality. The format, structure, and presentation of the information in IIU reports is often confusing and does not convey an understanding of the issues or the violations under investigation. Often, multiple source documents are pasted into the report narrative without any description or attempt to resolve confusion between the different sources of information. In many reports, the allegations are not clearly stated or clearly answered, the relevant facts bearing on the truth of each allegation are not analyzed or clearly reported; and the language is repetitive, resulting in reports that are overly long and difficult to read despite lacking critical content. Often the IIU investigator does not attempt to clarify inconsistences between or among witness statements, or between oral interviews and officer reports.

In one IIU investigation regarding allegations of excessive force conducted in the spring of 2016, IIU failed to interview several key witnesses who observed the incident. The incident so disturbed the witnesses that they recounted it in social media postings the same day. The IIU investigator knew who the witnesses were, where they lived, and had taken a statement from another witness confirming their identities, yet never interviewed them, noting instead in the report that "all efforts to contact [them] were unsuccessful," without any detail as to what "efforts" he made. Other IIU files document similar failings in following up with key witnesses, including law enforcement officers from other agencies, to conduct interviews and obtain essential information.[23]

These failures in how SPD investigates allegations of misconduct are directly attributable to the lack of adequate policies, guidance, and training for officers regarding how to conduct internal investigations. Although SPD's Policy Manual makes a general reference to IIU and

---

[23]    These deficiencies are not limited to investigations of excessive force, but instead are present across different types of investigations and reflect a broader and deeper lack of capacity within IIU. For example, when investigating a complaint that Narcotics Bureau officers were drinking alcohol on duty, IIU failed to interview at least a dozen named potential witnesses. Attempts to reach witnesses involved just making one phone call or sending one email before giving up. In that case, IIU ultimately interviewed only one witness who was not a law enforcement officer (who had no information). The investigative report consisted entirely of nearly identical statements from officers denying the allegations.

SPD does have an "IIU General Guidelines" document,[24] no policies specifically detail how IIU complaints are to be investigated, such as how IIU investigators should collect evidence, canvass for and interview witnesses, or draft investigative reports. Pursuant to the patrol officer and supervisor unions' CBAs, IIU also has a 90-day timeframe to finish investigations, which is short when compared to other law enforcement agencies. Nor does SPD supply IIU officers with sufficient training regarding their specific responsibilities as investigators.

> ### c. *Springfield's Community Police Hearing Board lacks the support and training it needs to make sound conclusions and determinations*

Springfield created the CPHB to increase transparency within SPD and enhance the Springfield community's involvement in ensuring accountability within their Police Department. In practice, however, the CPHB fails to fulfill these goals. The CPHB fails to equip its members with the training and resources needed to adequately perform these tasks. For example, unlike many other law enforcement agencies, SPD's complaint review and discipline system prohibits sworn internal investigations officers– those who conduct the investigations and have the most knowledge of the facts – from making conclusions and recommendations. Instead, it tasks community members, most of whom have little experience in policing, with making preliminary determinations on use-of-force allegations and recommending discipline without any meaningful guidance. Officers we spoke to perceive the CPHB as untrained laypeople who do not have the resources to competently assess evidence or reach sound conclusions; we also heard from community members who view the CPHB as politicized and ineffective. To the extent that the Springfield community seeks to have a board comprised of community members make additional recommendations regarding the disposition of misconduct investigations and potential discipline, steps must be taken to enable that responsibility to be carried out effectively and appropriately.

In any event, the CPHB receives very few use-of-force investigations to review. As discussed above, SPD supervisors have not referred a single Narcotics Bureau use-of-force incident to IIU for investigation; and between 2013-2016, only six complaints by members of the public involving excessive force by a Narcotics Bureau officer made it to IIU. In five of those six IIU cases involving allegations of excessive force by a Narcotics Bureau officer in 2013-2018, the officers were exonerated or the allegations were not sustained. The sixth case involves a Narcotics Bureau officer who has been charged with federal crimes related to his alleged use of force in the incident. In that case, the indicted officer negotiated a 60-day unpaid suspension and remains an SPD officer. Neither CPHB nor SPD made a finding regarding whether the officer's conduct violated policy in that case. While the Commissioner has the authority to impose discipline regardless of CPHB's recommendations to correct lapses in accountability; we found no cases where the Commissioner reversed the CPHB's recommendation.

> ### d. *SPD fails to impose discipline even in the rare cases where violations of policy are sustained*

As discussed above, we could not identify a single instance of SPD sustaining a finding of excessive force involving a Narcotics Bureau officer. But even in cases involving other types of misconduct, when IIU investigations are sustained, Narcotics Bureau officers rarely face

---

[24]      SPD Policy Manual, Rules 32 and 35.

discipline from SPD.  Narcotics Bureau officers are less likely to receive discipline from SPD compared to officers in other units.  Between 2013-2018, in cases where SPD sustained allegations of misconduct, 11% of allegations involving SPD officers outside of the Narcotics Bureau resulted in discipline, but only 5% of allegations involving Narcotics Bureau officers resulted in discipline.  In addition, there is no formal document or database recording past officer discipline to use as a guideline for the Commissioner.  As a result, there are apparent inconsistencies in discipline.

SPD's overall failure to discipline its officers for using excessive force is probative of SPD's failure to discipline Narcotics Bureau officers for using excessive force.  Records show that the failures within SPD's accountability systems are longstanding.  In addition to the instances of excessive force uncovered through our review, courts have found SPD officer misconduct on multiple occasions where SPD failed to hold officers accountable.  For example, a jury awarded $250,000 to a plaintiff after finding that an SPD officer (not in the Narcotics Bureau) used excessive force and committed assault and battery when he hit the plaintiff with a baton in 2013.  *Hutchins v. Springfield*, Case No. 3:16-cv-30008-NMG (D. Mass. Jan. 20, 2019).  SPD did not discipline any of the officers involved in the *Hutchins* case.  In another lawsuit against the City of Springfield, a plaintiff alleged that in 2012, several Narcotics Bureau officers punched the plaintiff in the jaw, beat him up, and hit him multiple times with the butt of a pistol.  *See Douglas v. Bigda*, No. 14-30210-MAP, Report and Recommendation Regarding Defendant's Motion for Summary Judgment (D. Mass. Oct. 14, 2016), adopted in full by the District Court judge in *Douglas v. City of Springfield*, No. CV 14-30210-MAP, 2017 WL 123422, at *1 (D. Mass. Jan. 12, 2017).  None of the Narcotics Bureau officers involved in this incident were investigated or disciplined by SPD.  The *Douglas* Court determined that "[a] reasonable finder of fact could also infer that there were flaws in the city's investigation of civilian complaints that demonstrated deliberate indifference to the risks posed by officers against whom large numbers of civilian complaints about excessive use of force had been made."  The *Douglas* lawsuit settled for $60,000 in 2017.  According to records created and produced by the City of Springfield and other publicly available reports, the City paid over $5.25 million in police misconduct settlements between 2006 and 2019.[25]  By contrast, two nearby cities of similar size, Bridgeport, Connecticut and Lowell, Massachusetts, appear to have paid $249,000 and $817,000, respectively, in police misconduct settlements during the same 13-year timeframe.[26]  This

---

[25]      *See* Stephanie Barry, *Springfield Paid Out $3.9 million Over 10 years in Police Misconduct Lawsuits*, MassLive, Sept. 6, 2017, available at https://www.masslive.com/news/2017/09/springfield_police_misconduct_lawsuits.html; Dan Glaun, *Springfield to Pay $885,000 in Settlements in Alleged 2015 Police Beating Even as Grand Jury Considers Indictments*, MassLive, Sept. 26, 2018, available at https://www.masslive.com/news/2018/09/post_1008.html (reporting $885,000 settlement); Peter Goonan, *Springfield City Council Approves $450,000 for Police Brutality Settlement*, MassLive, June 17, 2019, available at https://www.masslive.com/news/2019/06/springfield-city-council-approves-450000-for-police-brutality-settlement.html (reporting $450,000 settlement).

[26]      Bridgeport: *see* Daniel Tepfer, *City Settles Police Brutality Lawsuit*, CTPost, May 28, 2014, available at https://www.ctpost.com/local/article/City-settles-police-brutality-lawsuit-5508039.php (reporting $198,000 settlement); Daniel Tepfer, *City Pays Settlements in Police Brutality Cases*, CTPost, July 26, 2017, available at https://www.ctpost.com/local/article/City-pays-settlements-in-police-brutality-cases-11437279.php (reporting $16,000 settlement); Brian Lockhart, *Bridgeport Settles Lawsuit Over*

disparity supports our conclusion that SPD officers are engaging in a pattern or practice of excessive force. Yet, the SPD has failed to use its administrative powers to hold these officers accountable.

4. SPD's failure to train officers contributes to the pattern or practice of excessive force

SPD's Training Division does not conduct comprehensive in-service training for Narcotics Bureau officers, or any officers, on the use of punches and strikes– the types of force that underlie the pattern or practice we have identified. As a result, Narcotics Bureau officers must recall and rely on recruit training, often received years ago, when assessing when and how to deliver a punch or strike.

In addition, SPD Narcotics Bureau sergeants are not taught how to address Springfield- or supervisor-specific issues that may arise while they are managing officers. They do not receive formal training on the following important topics: how to complete SPD-276 forms; how to comprehensively review prisoner injury report narratives; how to follow up with officers about key report omissions and specious language; or how to handle any pushback from officers about the need to provide more detailed information in reports.

Finally, there is no coordination between command staff, IIU, those responsible for creating SPD policy, and the Training Division to identify problematic patterns or trends that evidence a need for additional training.

## IV.   PRELIMINARY ASSESSMENT OF REMEDIES

Addressing the constitutional violations we identified during our investigation will require changes to the policy, training, and accountability systems within the Narcotics Bureau of SPD. These changes would improve SPD's handling of force issues if they applied to SPD as a whole. Bringing about lawful and effective policing by the Narcotics Bureau will also require the sustained commitment of City and SPD leaders in ensuring accountability and transparency within SPD. While the full range of necessary measures is beyond the scope of this document, it is clear that changes in the following areas must be made:

1. Enhance Force Reporting and Review Procedures. SPD should implement a use-of-force reporting procedure that: (1) requires officers to report all uses of force, including hands-on uses of force, uses of force that do not result in injury, and uses of force that do not occur with an arrestee; and (2) instructs supervisors on how to review uses of force and

---

*Family's Arrest*, CTPost, Dec. 4, 2018, available at https://www.ctpost.com/local/article/Bridgeport-settles-lawsuit-over-family-s-arrest-13442920.php (reporting $35,000 settlement).

Lowell: *see* Robert Mills & Lauren Peterson, *City of Lowell to Settle Confidential Informant Lawsuit for $750G*, Lowell Sun, Oct. 18, 2017, available at https://www.lowellsun.com/2017/10/18/city-of-lowell-to-settle-confidential-informant-lawsuit-for-750g/ (reporting $750,000 settlement); Grant Welker, *Lowell Settlements Cost Taxpayers*, Lowell Sun, June 14, 2015, available at https://www.lowellsun.com/2015/06/14/lowell-settlements-cost-taxpayers/ (reporting one $27,000 settlement and two $20,000 settlements).

implement disciplinary action where necessary. Officers and supervisors should receive comprehensive training on the new reporting and review procedures.

2. <u>Adopt New Use-of-force Training</u>. New training curricula should explicitly address the importance of avoiding fist strikes to the head, neck, and face area, and avoiding kicking suspects. SPD should also expand its training on bystander liability to ensure officers intervene to prevent problematic events from escalating and report excessive uses of force that they witness.

3. <u>Review and Revise IIU Policies and Training</u>. IIU requires new policies, procedures, and training to ensure that civilian complaints are properly taken, and that IIU officers use proper interviewing and investigative techniques in order to conduct meaningful investigations.

4. <u>Increase Accountability Mechanisms</u>. SPD should adopt policies and procedures so that officer discipline is meaningful, consistent, and appropriate. SPD should also address the fact that administrative charges can be dismissed due to timeliness issues.

## V.    CONCLUSION

Our investigation has determined that there is reasonable cause to believe that Narcotics Bureau officers have engaged in a pattern or practice of excessive force, which is directly attributable to systemic deficiencies in SPD's policies, accountability systems, and training.

We are encouraged by SPD's cooperation and by its initial efforts to address reform. We hope SPD will take advantage of its new leadership and the retention of an outside consulting firm to resolve the issues we identified within the Narcotics Bureau. We look forward to working cooperatively with the City of Springfield and SPD to develop and implement sustainable reform measures to address the violations and deficiencies outlined in this report.